UNITED STATES *v.* MARTINEZ-FUERTE ET AL.

No. 74–1560.   Argued April 26, 1976—Decided July 6, 1976*

---

*Together with No. 75–5387, *Sifuentes* v. *United States,* on certiorari to the United States Court of Appeals for the Fifth Circuit.

544

*Mark L. Evans* argued the cause for the United States in both cases. With him on the briefs were *Solicitor General Bork, Assistant Attorney General Thornburgh,* and *Sidney M. Glazer.*

*Ballard Bennett,* by appointment of the Court, 423 U. S. 1030, argued the cause and filed briefs for petitioner in No. 75–5387.

*Charles M. Sevilla,* by appointment of the Court, 423 U. S. 922, argued the cause for respondents in No. 74–1560. With him on the brief was *Michael J. McCabe.*†

†*Melvin L. Wulf, Joel M. Gora, Vilma S. Martinez, Sanford J. Rosen,* and *Jerome B. Falk, Jr.,* filed a brief for the American Civil Liberties Union et al. as *amici curiae* urging affirmance in No. 74–1560.

MR. JUSTICE POWELL delivered the opinion of the Court.

These cases involve criminal prosecutions for offenses relating to the transportation of illegal Mexican aliens. Each defendant was arrested at a permanent checkpoint operated by the Border Patrol away from the international border with Mexico, and each sought the exclusion of certain evidence on the ground that the operation of the checkpoint was incompatible with the Fourth Amendment. In each instance whether the Fourth Amendment was violated turns primarily on whether a vehicle may be stopped at a fixed checkpoint for brief questioning of its occupants even though there is no reason. to believe the particular vehicle contains illegal aliens. We reserved this question last Term in *United States* v. *Ortiz,* 422 U. S. 891, 897 n. 3 (1975). We hold today that such stops are consistent with the Fourth Amendment. We also hold that the operation of a fixed checkpoint need not be authorized in advance by a judicial warrant.

I

A

The respondents in No. 74–1560 are defendants in three separate prosecutions resulting from arrests made on three different occasions at the permanent immigration checkpoint on Interstate 5 near San Clemente, Cal. Interstate 5 is the principal highway between San Diego and Los Angeles, and the San Clemente checkpoint is 66 road miles north of the Mexican border. We previously have described the checkpoint as follows:

> " 'Approximately one mile south of the checkpoint is a large black on yellow sign with flashing yellow lights over the highway stating "ALL VEHICLES, STOP AHEAD, 1 MILE." Three-quarters of a

mile further north are two black on yellow signs suspended over the highway with flashing lights stating "WATCH FOR BRAKE LIGHTS." At the checkpoint, which is also the location of a State of California weighing station, are two large signs with flashing red lights suspended over the highway. These signs each state "STOP HERE—U. S. OFFICERS." Placed on the highway are a number of orange traffic cones funneling traffic into two lanes where a Border Patrol agent in full dress uniform, standing behind a white on red "STOP" sign checks traffic. Blocking traffic in the unused lanes are official U. S. Border Patrol vehicles with flashing red lights. In addition, there is a permanent building which houses the Border Patrol office and temporary detention facilities. There are also floodlights for nighttime operation.' " *United States* v. *Ortiz, supra,* at 893, quoting *United States* v. *Baca,* 368 F. Supp. 398, 410–411 (SD Cal. 1973).

The "point" agent standing between the two lanes of traffic visually screens all northbound vehicles, which the checkpoint brings to a virtual, if not a complete, halt.[1] Most motorists are allowed to resume their progress without any oral inquiry or close visual examination. In a relatively small number of cases the "point" agent will conclude that further inquiry is in order. He directs these cars to a secondary inspection area, where their occupants are asked about their citizenship and immigration status. The Government informs us that at San

---

[1] The parties disagree as to whether vehicles not referred to the secondary inspection area are brought to a complete halt or merely "roll" slowly through the checkpoint. Resolution of this dispute is not necessary here, as we may assume, *arguendo,* that all motorists passing through the checkpoint are so slowed as to have been "seized."

Clemente the average length of an investigation in the secondary inspection area is three to five minutes. Brief for United States 53. A direction to stop in the secondary inspection area could be based on something suspicious about a particular car passing through the checkpoint, but the Government concedes that none of the three stops at issue in No. 74–1560 was based on any articulable suspicion. During the period when these stops were made, the checkpoint was operating under a magistrate's "warrant of inspection," which authorized the Border Patrol to conduct a routine-stop operation at the San Clemente location.[2]

We turn now to the particulars of the stops involved in No. 74–1560, and the procedural history of the case. Respondent Amado Martinez-Fuerte approached the checkpoint driving a vehicle containing two female passengers. The women were illegal Mexican aliens who had entered the United States at the San Ysidro port of entry by using false papers and rendezvoused with Martinez-Fuerte in San Diego to be transported northward. At the checkpoint their car was directed to the secondary inspection area. Martinez-Fuerte produced documents showing him to be a lawful resident alien, but his passengers admitted being present in the country unlawfully. He was charged, *inter alia,* with two counts of illegally transporting aliens in violation

---

[2] The record does not reveal explicitly why a warrant was sought. Shortly before the warrant application, however, the Court of Appeals for the Ninth Circuit had held unconstitutional a routine stop and search conducted at a permanent checkpoint without such a warrant. See *United States* v. *Bowen,* 500 F. 2d 960 (1974), aff'd on other grounds, 422 U. S. 916 (1975); *United States* v. *Juarez-Rodriguez,* 498 F. 2d 7 (1974). Soon after the warrant issued, the Court of Appeals also held unconstitutional routine checkpoint stops conducted without a warrant. See *United States* v. *Esquer-Rivera,* 500 F. 2d 313 (1974). See also n. 15, *infra.*

of 8 U. S. C. § 1324 (a)(2). He moved before trial to suppress all evidence stemming from the stop on the ground that the operation of the checkpoint was in violation of the Fourth Amendment.[3] The motion to suppress was denied, and he was convicted on both counts after a jury trial.

Respondent Jose Jiminez-Garcia attempted to pass through the checkpoint while driving a car containing one passenger. He had picked the passenger up by pre-arrangement in San Ysidro after the latter had been smuggled across the border. Questioning at the second-ary inspection area revealed the illegal status of the passenger, and Jiminez-Garcia was charged in two counts with illegally transporting an alien, 8 U. S. C. § 1324 (a) (2), and conspiring to commit that offense, 18 U. S. C. § 371. His motion to suppress the evidence derived from the stop was granted.

Respondents Raymond Guillen and Fernando Me-drano-Barragan approached the checkpoint with Guillen driving and Medrano-Barragan and his wife as passen-gers. Questioning at the secondary inspection area re-vealed that Medrano-Barragan and his wife were illegal aliens. A subsequent search of the car uncovered three other illegal aliens in the trunk. Medrano-Barragan had led the other aliens across the border at the beach near Tijuana, Mexico, where they rendezvoused with Guillen, a United States citizen. Guillen and Medrano-Barragan were jointly indicted on four counts of illegally trans-

---

[3] Each of the defendants in No. 74–1560 and the defendant in No. 75–5387 sought to suppress, among other things, the testimony of one or more illegal aliens. We noted in *United States* v. *Brig-noni-Ponce,* 422 U. S. 873, 876 n. 2 (1975), that "[t]here may be room to question whether voluntary testimony of a witness at trial, as opposed to a Government agent's testimony about objects seized or statements overheard, is subject to suppression . . . ." The question again is not before us.

porting aliens, 8 U. S. C. § 1324 (a)(2), four counts of inducing the illegal entry of aliens, § 1324 (a)(4), and one conspiracy count, 18 U. S. C. § 371. The District Court granted the defendants' motion to suppress.

Martinez-Fuerte appealed his conviction, and the Government appealed the granting of the motions to suppress in the respective prosecutions of Jiminez-Garcia and of Guillen and Medrano-Barragan.[4] The Court of Appeals for the Ninth Circuit consolidated the three appeals, which presented the common question whether routine stops and interrogations at checkpoints are consistent with the Fourth Amendment.[5] The Court of Appeals held, with one judge dissenting, that these stops violated the Fourth Amendment, concluding that a stop for inquiry is constitutional only if the Border Patrol reasonably suspects the presence of illegal aliens on the basis of articulable facts. It reversed Martinez-Fuerte's conviction, and affirmed the orders to suppress in the other cases. 514 F. 2d 308 (1975). We reverse and remand.

B

Petitioner in No. 75–5387, Rodolfo Sifuentes, was arrested at the permanent immigration checkpoint on U. S. Highway 77 near Sarita, Tex. Highway 77 originates in Brownsville, and it is one of the two major highways running north from the lower Rio Grande valley. The Sarita checkpoint is about 90 miles north of Browns-

---

[4] The prosecution of Martinez-Fuerte was before a different District Judge than were the other cases.

[5] The principal question before the Court of Appeals was the constitutional significance of the "warrant of inspection" under which the checkpoint was operating when the defendants were stopped. See n. 15, infra. The Government, however, preserved the question whether routine checkpoint stops could be made absent a warrant.

ville, and 65–90 miles from the nearest points of the Mexican border. The physical arrangement of the checkpoint resembles generally that at San Clemente, but the checkpoint is operated differently in that the officers customarily stop all northbound motorists for a brief inquiry. Motorists whom the officers recognize as local inhabitants, however, are waved through the checkpoint without inquiry. Unlike the San Clemente checkpoint the Sarita operation was conducted without a judicial warrant.

Sifuentes drove up to the checkpoint without any visible passengers. When an agent approached the vehicle, however, he observed four passengers, one in the front seat and the other three in the rear, slumped down in the seats. Questioning revealed that each passenger was an illegal alien, although Sifuentes was a United States citizen. The aliens had met Sifuentes in the United States, by prearrangement, after swimming across the Rio Grande.

Sifuentes was indicted on four counts of illegally transporting aliens. 8 U. S. C. § 1324 (a)(2). He moved on Fourth Amendment grounds to suppress the evidence derived from the stop. The motion was denied and he was convicted after a jury trial. Sifuentes renewed his Fourth Amendment argument on appeal, contending primarily that stops made without reason to believe a car is transporting aliens illegally are unconstitutional. The United States Court of Appeals for the Fifth Circuit affirmed the conviction, 517 F. 2d 1402 (1975), relying on its opinion in *United States v. Santibanez*, 517 F. 2d 922 (1975). There the Court of Appeals had ruled that routine checkpoint stops are consistent with the Fourth Amendment. We affirm.[6]

---

[6] We initially granted the Government's petition for a writ of certiorari in No. 74–1560, 423 U. S. 822, and later granted Sifuentes'

## II

The Courts of Appeals for the Ninth and the Fifth Circuits are in conflict on the constitutionality of a law enforcement technique considered important by those charged with policing the Nation's borders. Before turning to the constitutional question, we examine the context in which it arises.

### A

It has been national policy for many years to limit immigration into the United States. Since July 1, 1968, the annual quota for immigrants from all independent countries of the Western Hemisphere, including Mexico, has been 120,000 persons. Act of Oct. 3, 1965, § 21 (e), 79 Stat. 921. Many more aliens than can be accommodated under the quota want to live and work in the United States. Consequently, large numbers of aliens seek illegally to enter or to remain in the United States. We noted last Term that "[e]stimates of the number of illegal immigrants [already] in the United States vary widely. A conservative estimate in 1972 produced a figure of about one million, but the Immigration and Naturalization Service now suggests there may be as many as 10 or 12 million aliens illegally in the country." *United States* v. *Brignoni-Ponce,* 422 U. S. 873, 878 (1975) (footnote omitted). It is estimated that 85% of the illegal immigrants are from Mexico, drawn by the fact that economic opportunities are significantly greater in the United States than they are in Mexico. *United States* v. *Baca,* 368 F. Supp., at 402.

---

petition in No. 75–5387 and directed that the cases be argued in tandem. 423 U. S. 945. Subsequently we granted the motion of the Solicitor General to consolidate the cases for oral argument. 425 U. S. 931.

Interdicting the flow of illegal entrants from Mexico poses formidable law enforcement problems. The principal problem arises from surreptitious entries. *Id.*, at 405. The United States shares a border with Mexico that is almost 2,000 miles long, and much of the border area is uninhabited desert or thinly populated arid land. Although the Border Patrol maintains personnel, electronic equipment, and fences along portions of the border, it remains relatively easy for individuals to enter the United States without detection. It also is possible for an alien to enter unlawfully at a port of entry by the use of falsified papers or to enter lawfully but violate restrictions of entry in an effort to remain in the country unlawfully.[7] Once within the country, the aliens seek to travel inland to areas where employment is believed to be available, frequently meeting by prearrangement with friends or professional smugglers who transport them in private vehicles. *United States* v. *Brignoni-Ponce, supra,* at 879.

The Border Patrol conducts three kinds of inland traffic-checking operations in an effort to minimize illegal immigration. Permanent checkpoints, such as those at San Clemente and Sarita, are maintained at or near intersections of important roads leading away from the border. They operate on a coordinated basis designed to avoid circumvention by smugglers and others who transport the illegal aliens. Temporary checkpoints, which operate like permanent ones, occasionally are established in other strategic locations. Finally, roving patrols are maintained to supplement the checkpoint system. See *Almeida-Sanchez* v. *United*

---

[7] The latter occurs particularly where "border passes" are issued to simplify passage between interrelated American and Mexican communities along the border. These passes authorize travel within 25 miles of the border for a 72-hour period. See 8 CFR § 212.6 (1976).

*States,* 413 U. S. 266, 268 (1973).[8] In fiscal 1973, 175,-511 deportable aliens were apprehended throughout the Nation by "line watch" agents stationed at the border itself. Traffic-checking operations in the interior apprehended approximately 55,300 more deportable aliens.[9] Most of the traffic-checking apprehensions were at checkpoints, though precise figures are not available. *United States* v. *Baca, supra,* at 405, 407, and n. 2.

## B

We are concerned here with permanent checkpoints, the locations of which are chosen on the basis of a number of factors. The Border Patrol believes that to assure effectiveness, a checkpoint must be (i) distant enough from the border to avoid interference with traffic in populated areas near the border, (ii) close to the confluence of two or more significant roads leading away from the border, (iii) situated in terrain that restricts vehicle passage around the checkpoint, (iv) on a stretch of highway compatible with safe operation, and (v) beyond the 25-mile zone in which "border passes," see n. 7, *supra,* are valid. *United States* v. *Baca, supra,* at 406.

---

[8] All these operations are conducted pursuant to statutory authorizations empowering Border Patrol agents to interrogate those believed to be aliens as to their right to be in the United States and to inspect vehicles for aliens. 8 U. S. C. §§ 1357 (a)(1), (a)(3). Under current regulations the authority conferred by § 1357 (a)(3) may be exercised anywhere within 100 air miles of the border. 8 CFR § 287.1 (a) (1976).

[9] As used in these statistics, the term "deportable alien" means "a person who has been found to be deportable by an immigration judge, or who admits his deportability upon questioning by official agents." *United States* v. *Baca,* 368 F. Supp. 398, 404 (SD Cal. 1973). Most illegal aliens are simply deported without prosecution. The Government routinely prosecutes persons thought to be smugglers, many of whom are lawfully in the United States.

The record in No. 74–1560 provides a rather complete picture of the effectiveness of the San Clemente checkpoint. Approximately 10 million cars pass the checkpoint location each year, although the checkpoint actually is in operation only about 70% of the time.[10] In calendar year 1973, approximately 17,000 illegal aliens were apprehended there. During an eight-day period in 1974 that included the arrests involved in No. 74–1560, roughly 146,000 vehicles passed through the checkpoint during 124⅙ hours of operation. Of these, 820 vehicles were referred to the secondary inspection area, where Border Patrol agents found 725 deportable aliens in 171 vehicles. In all but two cases, the aliens were discovered without a conventional search of the vehicle. A similar rate of apprehensions throughout the year would have resulted in an annual total of over 33,000, although the Government contends that many illegal aliens pass through the checkpoint undetected. The record in No. 75–5387 does not provide comparable statistical information regarding the Sarita checkpoint. While it appears that fewer illegal aliens are apprehended there, it may be assumed that fewer pass by undetected, as every motorist is questioned.

## III

The Fourth Amendment imposes limits on search-and-seizure powers in order to prevent arbitrary and oppressive interference by enforcement officials with the privacy and personal security of individuals. See *United States* v. *Brignoni-Ponce,* 422 U. S., at 878; *United States* v. *Ortiz,* 422 U. S., at 895; *Camara* v. *Municipal Court,*

---

[10] The Sarita checkpoint is operated a comparable proportion of the time. "Down" periods are caused by personnel shortages, weather conditions, and—at San Clemente—peak traffic loads.

387 U. S. 523, 528 (1967). In delineating the constitutional safeguards applicable in particular contexts, the Court has weighed the public interest against the Fourth Amendment interest of the individual, *United States* v. *Brignoni-Ponce, supra,* at 878; *Terry* v. *Ohio,* 392 U. S. 1, 20–21 (1968), a process evident in our previous cases dealing with Border Patrol traffic-checking operations.

In *Almeida-Sanchez* v. *United States, supra,* the question was whether a roving-patrol unit constitutionally could search a vehicle for illegal aliens simply because it was in the general vicinity of the border. We recognized that important law enforcement interests were at stake but held that searches by roving patrols impinged so significantly on Fourth Amendment privacy interests that a search could be conducted without consent only if there was probable cause to believe that a car contained illegal aliens, at least in the absence of a judicial warrant authorizing random searches by roving patrols in a given area. Compare 413 U. S., at 273, with *id.,* at 283–285 (POWELL, J., concurring), and *id.,* at 288 (WHITE, J., dissenting). We held in *United States* v. *Ortiz, supra,* that the same limitations applied to vehicle searches conducted at a permanent checkpoint.

In *United States* v. *Brignoni-Ponce, supra,* however, we recognized that other traffic-checking practices involve a different balance of public and private interests and appropriately are subject to less stringent constitutional safeguards. The question was under what circumstances a roving patrol could stop motorists in the general area of the border for brief inquiry into their residence status. We found that the interference with Fourth Amendment interests involved in such a stop was "modest," 422 U. S., at 880, while the inquiry served significant law enforcement needs. We therefore held that a roving-patrol stop need not be justified by probable

cause and may be undertaken if the stopping officer is "aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion" that a vehicle contains illegal aliens. *Id.*, at 884.[11]

## IV

It is agreed that checkpoint stops are "seizures" within the meaning of the Fourth Amendment. The defendants contend primarily that the routine stopping of vehicles at a checkpoint is invalid because *Brignoni-Ponce* must be read as proscribing any stops in the absence of reasonable suspicion. Sifuentes alternatively contends in No. 75–5387 that routine checkpoint stops are permissible only when the practice has the advance judicial authorization of a warrant. There was a warrant authorizing the stops at San Clemente but none at Sarita. As we reach the issue of a warrant requirement only if reasonable suspicion is not required, we turn first to whether reasonable suspicion is a prerequisite to a valid stop, a question to be resolved by balancing the interests at stake.

## A

Our previous cases have recognized that maintenance of a traffic-checking program in the interior is necessary because the flow of illegal aliens cannot be controlled effectively at the border. We note here only the substantiality of the public interest in the practice of routine stops for inquiry at permanent checkpoints, a practice which the Government identifies as the most important of the traffic-checking operations. Brief for United States in No. 74–1560, pp. 19–20.[12] These checkpoints

---

[11] On the facts of the case, we concluded that the stop was impermissible because reasonable suspicion was lacking.

[12] The defendants argue at length that the public interest in maintaining checkpoints is less than is asserted by the Govern-

are located on important highways; in their absence such highways would offer illegal aliens a quick and safe route into the interior. Routine checkpoint inquiries apprehend many smugglers and illegal aliens who succumb to the lure of such highways. And the prospect of such inquiries forces others onto less efficient roads that are less heavily traveled, slowing their movement and making them more vulnerable to detection by roving patrols. Cf. *United States* v. *Brignoni-Ponce*, 422 U. S., at 883–885.

A requirement that stops on major routes inland always be based on reasonable suspicion would be impractical because the flow of traffic tends to be too heavy to allow the particularized study of a given car that would enable it to be identified as a possible carrier of illegal aliens. In particular, such a requirement would largely eliminate any deterrent to the conduct of well-disguised smuggling operations, even though smugglers are known to use these highways regularly.

### B

While the need to make routine checkpoint stops is great, the consequent intrusion on Fourth Amendment interests is quite limited. The stop does intrude to a limited extent on motorists' right to "free passage with-

---

ment because the flow of illegal immigrants could be reduced by means other than checkpoint operations. As one alternative they suggest legislation prohibiting the knowing employment of illegal aliens. The logic of such elaborate less-restrictive-alternative arguments could raise insuperable barriers to the exercise of virtually all search-and-seizure powers. In any event, these arguments tend to go to the general proposition that all traffic-checking procedures are impermissible, a premise our previous cases reject. The defendants do not suggest persuasively that the particular law enforcement needs served by checkpoints could be met without reliance on routine checkpoint stops. Compare *United States* v. *Brignoni-Ponce*, 422 U. S., at 883 (effectiveness of roving patrols not defeated by reasonable suspicion requirement), with *infra,* this page.

out interruption," *Carroll* v. *United States,* 267 U. S. 132, 154 (1925), and arguably on their right to personal security. But it involves only a brief detention of travelers during which

> " '[a]ll that is required of the vehicle's occupants is a response to a brief question or two and possibly the production of a document evidencing a right to be in the United States.' " *United States* v. *Brignoni-Ponce, supra,* at 880.

Neither the vehicle nor its occupants are searched, and visual inspection of the vehicle is limited to what can be seen without a search. This objective intrusion—the stop itself, the questioning, and the visual inspection—also existed in roving-patrol stops. But we view checkpoint stops in a different light because the subjective intrusion—the generating of concern or even fright on the part of lawful travelers—is appreciably less in the case of a checkpoint stop. In *Ortiz,* we noted:

> "[T]he circumstances surrounding a checkpoint stop and search are far less intrusive than those attending a roving-patrol stop. Roving patrols often operate at night on seldom-traveled roads, and their approach may frighten motorists. At traffic checkpoints the motorist can see that other vehicles are being stopped, he can see visible signs of the officers' authority, and he is much less likely to be frightened or annoyed by the intrusion." 422 U. S., at 894–895.

In *Brignoni-Ponce,* we recognized that Fourth Amendment analysis in this context also must take into account the overall degree of interference with legitimate traffic. 422 U. S., at 882–883. We concluded there that random roving-patrol stops could not be tolerated because they "would subject the residents of . . . [border] areas to

potentially unlimited interference with their use of the highways, solely at the discretion of Border Patrol officers. . . . [They] could stop motorists at random for questioning, day or night, anywhere within 100 air miles of the 2,000-mile border, on a city street, a busy highway, or a desert road . . . ." *Ibid.* There also was a grave danger that such unreviewable discretion would be abused by some officers in the field. *Ibid.*

Routine checkpoint stops do not intrude similarly on the motoring public. First, the potential interference with legitimate traffic is minimal. Motorists using these highways are not taken by surprise as they know, or may obtain knowledge of, the location of the checkpoints and will not be stopped elsewhere. Second, checkpoint operations both appear to and actually involve less discretionary enforcement activity. The regularized manner in which established checkpoints are operated is visible evidence, reassuring to law-abiding motorists, that the stops are duly authorized and believed to serve the public interest. The location of a fixed checkpoint is not chosen by officers in the field, but by officials responsible for making overall decisions as to the most effective allocation of limited enforcement resources. We may assume that such officials will be unlikely to locate a checkpoint where it bears arbitrarily or oppressively on motorists as a class. And since field officers may stop only those cars passing the checkpoint, there is less room for abusive or harassing stops of individuals than there was in the case of roving-patrol stops. Moreover, a claim that a particular exercise of discretion in locating or operating a checkpoint is unreasonable is subject to post-stop judicial review.[13]

---

[13] The choice of checkpoint locations must be left largely to the discretion of Border Patrol officials, to be exercised in accordance

The defendants arrested at the San Clemente checkpoint suggest that its operation involves a significant extra element of intrusiveness in that only a small percentage of cars are referred to the secondary inspection area, thereby "stigmatizing" those diverted and reducing the assurances provided by equal treatment of all motorists. We think defendants overstate the consequences. Referrals are made for the sole purpose of conducting a routine and limited inquiry into residence status that cannot feasibly be made of every motorist where the traffic is heavy. The objective intrusion of the stop and inquiry thus remains minimal. Selective referral may involve some annoyance, but it remains true that the stops should not be frightening or offensive because of their public and relatively routine nature. Moreover, selective referrals—rather than questioning the occupants of every car—tend to advance some Fourth Amendment interests by minimizing the intrusion on the general motoring public.

## C

The defendants note correctly that to accommodate public and private interests some quantum of individualized suspicion is usually a prerequisite to a constitutional search or seizure.[14] See *Terry* v. *Ohio,* 392

---

with statutes and regulations that may be applicable. See n. 15, *infra*. Many incidents of checkpoint operation also must be committed to the discretion of such officials. But see *infra,* at 565–566.

[14] Stops for questioning, not dissimilar to those involved here, are used widely at state and local levels to enforce laws regarding drivers' licenses, safety requirements, weight limits, and similar matters. The fact that the purpose of such laws is said to be administrative is of limited relevance in weighing their intrusiveness on one's right to travel; and the logic of the defendants' position, if realistically pursued, might prevent enforcement officials from stopping motorists for questioning on these matters in the absence of reasonable suspicion that a law was being violated. As

U. S., at 21, and n. 18. But the Fourth Amendment imposes no irreducible requirement of such suspicion. This is clear from *Camara* v. *Municipal Court,* 387 U. S. 523 (1967). See also *Almeida-Sanchez* v. *United States,* 413 U. S., at 283–285 (POWELL, J., concurring); *id.,* at 288 (WHITE, J., dissenting); *Colonnade Catering Corp.* v. *United States,* 397 U. S. 72 (1970); *United States* v. *Biswell,* 406 U. S. 311 (1972); *Carroll* v. *United States,* 267 U. S., at 154. In *Camara* the Court required an "area" warrant to support the reasonableness of inspecting private residences within a particular area for building code violations, but recognized that "specific knowledge of the condition of the particular dwelling" was not required to enter any given residence. 387 U. S., at 538. In so holding, the Court examined the government interests advanced to justify such routine intrusions "upon the constitutionally protected interests of the private citizen," *id.,* at 534–535, and concluded that under the circumstances the government interests outweighed those of the private citizen.

We think the same conclusion is appropriate here, where we deal neither with searches nor with the sanctity of private dwellings, ordinarily afforded the most stringent Fourth Amendment protection. See, *e. g., McDonald* v. *United States,* 335 U. S. 451 (1948). As we have noted earlier, one's expectation of privacy in an automobile and of freedom in its operation are significantly different from the traditional expectation of privacy and freedom in one's residence. *United States* v. *Ortiz,* 422 U. S., at 896 n. 2; see *Cardwell* v. *Lewis,* 417 U. S. 583, 590–591 (1974) (plurality

---

such laws are not before us, we intimate no view respecting them other than to note that this practice of stopping automobiles briefly for questioning has a long history evidencing its utility and is accepted by motorists as incident to highway use.

opinion). And the reasonableness of the procedures followed in making these checkpoint stops makes the resulting intrusion on the interests of motorists minimal. On the other hand, the purpose of the stops is legitimate and in the public interest, and the need for this enforcement technique is demonstrated by the records in the cases before us. Accordingly, we hold that the stops and questioning at issue may be made in the absence of any individualized suspicion at reasonably located checkpoints.[15]

[15] As a judicial warrant authorized the Border Patrol to make routine stops at the San Clemente checkpoint, the principal question addressed by the Court of Appeals for the Ninth Circuit in No. 74–1560 was whether routine checkpoint stops were constitutional when authorized by warrant. Cf. n. 5, *supra*. The Court of Appeals held alternatively that a warrant never could authorize such stops, 514 F. 2d 308, 318 (1975), and that it was unreasonable to issue a warrant authorizing routine stops at the San Clemente location. *Id.*, at 321–322. In reaching the latter conclusion, the Court of Appeals relied on (i) "the [low] frequency with which illegal aliens pass through the San Clemente checkpoint," (ii) the distance of the checkpoint from the border, and (iii) the interference with legitimate traffic. *Ibid.* We need not address these holdings specifically, as we conclude that no warrant is needed. But we deem the argument by the defendants in No. 74–1560 in support of the latter holding to raise the question whether, even though a warrant is not required, it is unreasonable to locate a checkpoint at San Clemente.

We answer this question in the negative. As indicated above, the choice of checkpoint locations is an administrative decision that must be left largely within the discretion of the Border Patrol, see n. 13, *supra; cf. Camara* v. *Municipal Court,* 387 U. S. 523, 538 (1967). We think the decision to locate a checkpoint at San Clemente was reasonable. The location meets the criteria prescribed by the Border Patrol to assure effectiveness, see *supra,* at 553, and the evidence supports the view that the needs of law enforcement are furthered by this location. The absolute number of apprehensions at the checkpoint is high, see *supra,* at 554, confirming Border Patrol judgment that significant numbers of illegal aliens

We further believe that it is constitutional to refer motorists selectively to the secondary inspection area at the San Clemente checkpoint on the basis of criteria that would not sustain a roving-patrol stop. Thus, even if it be assumed that such referrals are made largely on the basis of apparent Mexican ancestry,[16] we perceive no constitutional violation. Cf. *United States* v. *Brignoni-Ponce,* 422 U. S., at 885–887. As the intrusion here is sufficiently minimal that no particularized reason need exist to justify it, we think it follows that the Border Patrol

regularly use Interstate 5 at this point. Also, San Clemente was selected as the location where traffic is lightest between San Diego and Los Angeles, thereby minimizing interference with legitimate traffic.

No question has been raised about the reasonableness of the location of the Sarita checkpoint. ·

[16] The Government suggests that trained Border Patrol agents rely on factors in addition to apparent Mexican ancestry when selectively diverting motorists. Brief for United States in No. 75–5387, p. 9; see *United States* v. *Brignoni-Ponce,* 422 U. S., at 884–885. This assertion finds support in the record. Less than 1% of the motorists passing the checkpoint are stopped for questioning, whereas American citizens of Mexican ancestry and legally resident Mexican citizens constitute a significantly larger proportion of the population of southern California. The 1970 census figures, which may not fully reflect illegal aliens, show the population of California to be approximately 19,958,000 of whom some 3,102,000, or 16%, are Spanish-speaking or of Spanish surname. The equivalent percentages for metropolitan San Diego and Los Angeles are 13% and 18% respectively. U. S. Department of Commerce, 1970 Census of Population, vol. 1, pt. 6, Tables 48, 140. If the statewide population ratio is applied to the approximately 146,000 vehicles passing through the checkpoint during the eight days surrounding the arrests in No. 74–1560, roughly 23,400 would be expected to contain persons of Spanish or Mexican ancestry, yet only 820 were referred to the secondary area. This appears to refute any suggestion that the Border Patrol relies extensively on apparent Mexican ancestry standing alone in referring motorists to the secondary area.

officers must have wide discretion in selecting the motorists to be diverted for the brief questioning involved.[17]

## V

Sifuentes' alternative argument is that routine stops at a checkpoint are permissible only if a warrant has given judicial authorization to the particular checkpoint location and the practice of routine stops. A warrant requirement in these circumstances draws some support from *Camara,* where the Court held that, absent consent, an "area" warrant was required to make a building code inspection, even though the search could be conducted absent cause to believe that there were violations in the building searched.[18]

We do not think, however, that *Camara* is an apt

---

[17] Of the 820 vehicles referred to the secondary inspection area during the eight days surrounding the arrests involved in No. 74–1560, roughly 20% contained illegal aliens. *Supra,* at 554. Thus, to the extent that the Border Patrol relies on apparent Mexican ancestry at this checkpoint, see n. 16, *supra,* that reliance clearly is relevant to the law enforcement need to be served. Cf. *United States* v. *Brignoni-Ponce, supra,* at 886–887, where we noted that "[t]he likelihood that any given person of Mexican ancestry is an alien is high enough to make Mexican appearance a relevant factor . . . ," although we held that apparent Mexican ancestry by itself could not create the reasonable suspicion required for a roving-patrol stop. Different considerations would arise if, for example, reliance were put on apparent Mexican ancestry at a checkpoint operated near the Canadian border.

[18] There also is some support for a warrant requirement in the concurring and dissenting opinions in *Almeida-Sanchez* v. *United States,* 413 U. S. 266 (1973), which commanded the votes of five Justices. See *id.,* at 283–285 (POWELL, J., concurring) ; *id.,* at 288 (WHITE, J., dissenting). The burden of these opinions, however, was that an "area" warrant could serve as a substitute for the individualized probable cause to search that otherwise was necessary to sustain roving-patrol searches. As particularized suspicion is not necessary here, the warrant function discussed in *Almeida-Sanchez* is not an issue in these cases.

model. It involved the search of private residences, for which a warrant traditionally has been required. See, e. g., *McDonald* v. *United States,* 335 U. S. 451 (1948). As developed more fully above, the strong Fourth Amendment interests that justify the warrant requirement in that context are absent here. The degree of intrusion upon privacy that may be occasioned by a search of a house hardly can be compared with the minor interference with privacy resulting from the mere stop for questioning as to residence. Moreover, the warrant requirement in *Camara* served specific Fourth Amendment interests to which a warrant requirement here would make little contribution. The Court there said:

"[W]hen [an] inspector [without a warrant] demands entry, the occupant has no way of knowing whether enforcement of the municipal code involved requires inspection of his premises, no way of knowing the lawful limits of the inspector's power to search, and no way of knowing whether the inspector himself is acting under proper authorization." 387 U. S., at 532.

A warrant provided assurance to the occupant on these scores. We believe that the visible manifestations of the field officers' authority at a checkpoint provide substantially the same assurances in this case.

Other purposes served by the requirement of a warrant also are inapplicable here. One such purpose is to prevent hindsight from coloring the evaluation of the reasonableness of a search or seizure. Cf. *United States* v. *Watson,* 423 U. S. 411, 455–456, n. 22 (1976) (MARSHALL, J., dissenting). The reasonableness of checkpoint stops, however, turns on factors such as the location and method of operation of the checkpoint, factors that are not susceptible to the distortion of hindsight, and therefore will be open to post-stop review notwith-

standing the absence of a warrant. Another purpose for a warrant requirement is to substitute the judgment of the magistrate for that of the searching or seizing officer. *United States* v. *United States District Court,* 407 U. S. 297, 316–318 (1972). But the need for this is reduced when the decision to "seize" is not entirely in the hands of the officer in the field, and deference is to be given to the administrative decisions of higher ranking officials.

## VI

In summary, we hold that stops for brief questioning routinely conducted at permanent checkpoints are consistent with the Fourth Amendment and need not be authorized by warrant.[19] The principal protection of Fourth

[19] MR. JUSTICE BRENNAN's dissenting opinion reflects unwarranted concern in suggesting that today's decision marks a radical new intrusion on citizens' rights: It speaks of the "evisceration of Fourth Amendment protections," and states that the Court "virtually empties the Amendment of its reasonableness requirement." *Post,* at 567, 568. Since 1952, Act of June 27, 1952, 66 Stat. 233, Congress has expressly authorized persons believed to be aliens to be interrogated as to residence, and vehicles "within a reasonable distance" from the border to be searched for aliens. See n. 8, *supra.* The San Clemente checkpoint has been operating at or near its present location throughout the intervening 24 years. Our prior cases have limited significantly the reach of this congressional authorization, requiring probable cause for any vehicle search in the interior and reasonable suspicion for inquiry stops by roving patrols. See *supra,* at 555–556. Our holding today, approving routine stops for brief questioning (a type of stop familiar to all motorists) is confined to permanent checkpoints. We understand, of course, that neither longstanding congressional authorization nor widely prevailing practice justifies a constitutional violation. We do suggest, however, that against this background and in the context of our recent decisions, the rhetoric of the dissent reflects unjustified concern.

The dissenting opinion further warns:

"Every American citizen of Mexican ancestry and every Mexican alien lawfully in this country must know after today's decision that

Amendment rights at checkpoints lies in appropriate limitations on the scope of the stop. See *Terry* v. *Ohio,* 392 U. S., at 24–27; *United States* v. *Brignoni-Ponce,* 422 U. S., at 881–882. We have held that checkpoint searches are constitutional only if justified by consent or probable cause to search. *United States* v. *Ortiz,* 422 U. S. 891 (1975). And our holding today is limited to the type of stops described in this opinion. "[A]ny further detention . . . must be based on consent or probable cause." *United States* v. *Brignoni-Ponce, supra,* at 882. None of the defendants in these cases argues that the stopping officers exceeded these limitations. Consequently, we affirm the judgment of the Court of Appeals for the Fifth Circuit, which had affirmed the conviction of Sifuentes. We reverse the judgment of the Court of Appeals for the Ninth Circuit and remand the case with directions to affirm the conviction of Martinez-Fuerte and to remand the other cases to the District Court for further proceedings.

*It is so ordered.*

MR. JUSTICE BRENNAN, with whom MR. JUSTICE MARSHALL joins, dissenting.

Today's decision is the ninth this Term marking the continuing evisceration of Fourth Amendment protections against unreasonable searches and seizures. Early in the Term, *Texas* v. *White,* 423 U. S. 67 (1975), permitted the warrantless search of an automobile in police custody despite the unreasonableness of the custody

---

he travels the fixed checkpoint highways at [his] risk . . . ." *Post,* at 572.

For the reason stated in n. 16, *supra,* this concern is misplaced. Moreover, upon a proper showing, courts would not be powerless to prevent the misuse of checkpoints to harass those of Mexican ancestry.

and opportunity to obtain a warrant. *United States* v. *Watson,* 423 U. S. 411 (1976), held that regardless of whether opportunity exists to obtain a warrant, an arrest in a public place for a previously committed felony never requires a warrant, a result certainly not fairly supported by either history or precedent. See *id.,* at 433 (MARSHALL, J., dissenting). *United States* v. *Santana,* 427 U. S. 38 (1976), went further and approved the warrantless arrest for a felony of a person standing on the front porch of her residence. *United States* v. *Miller,* 425 U. S. 435 (1976), narrowed the Fourth Amendment's protection of privacy by denying the existence of a protectible interest in the compilation of checks, deposit slips, and other records pertaining to an individual's bank account. *Stone* v. *Powell, ante,* p. 465, precluded the assertion of Fourth Amendment claims in federal collateral relief proceedings. *United States* v. *Janis, ante,* p. 433, held that evidence unconstitutionally seized by a state officer is admissible in a civil proceeding by or against the United States. *South Dakota* v. *Opperman, ante,* p. 364, approved sweeping inventory searches of automobiles in police custody irrespective of the particular circumstances of the case. Finally, in *Andresen* v. *Maryland,* 427 U. S. 463 (1976), the Court, in practical effect, weakened the Fourth Amendment prohibition against general warrants.

Consistent with this purpose to debilitate Fourth Amendment protections, the Court's decision today virtually empties the Amendment of its reasonableness requirement by holding that law enforcement officials manning fixed checkpoint stations who make standardless seizures of persons do not violate the Amendment. This holding cannot be squared with this Court's recent decisions in *United States* v. *Ortiz,* 422 U. S. 891 (1975); *United States* v. *Brignoni-Ponce,* 422 U. S. 873 (1975);

and *Almeida-Sanchez* v. *United States,* 413 U. S. 266 (1973). I dissent.

While the requisite justification for permitting a search or seizure may vary in certain contexts, compare *Beck* v. *Ohio,* 379 U. S. 89 (1964), with *Terry* v. *Ohio,* 392 U. S. 1 (1968), and *Camara* v. *Municipal Court,* 387 U. S. 523 (1967), even in the exceptional situations permitting intrusions on less than probable cause, it has long been settled that justification must be measured by objective standards. Thus in the seminal decision justifying intrusions on less-than-probable cause, *Terry* v. *Ohio, supra,* the Court said:

> "The scheme of the Fourth Amendment becomes meaningful only when it is assured that at some point the conduct of those charged with enforcing the laws can be subjected to the more detached, neutral scrutiny of a judge who must evaluate the reasonableness of a particular search or seizure in light of the particular circumstances. And in making that assessment it is imperative that the facts be judged against an *objective standard* . . . . Anything less would invite intrusions upon constitutionally guaranteed rights based on nothing more substantial than inarticulate hunches, a result this Court has consistently refused to sanction." 392 U. S., at 21–22 (emphasis added, footnote omitted).
>
> "This demand for specificity in the information upon which police action is predicated is the central teaching of this Court's Fourth Amendment jurisprudence." 392 U. S., at 21 n. 18.

*Terry* thus made clear what common sense teaches: Conduct, to be reasonable, must pass muster under objective standards applied to specific facts.

We are told today, however, that motorists without number may be individually stopped, questioned, visu-

ally inspected, and then further detained without even a showing of articulable suspicion, see *ante,* at 547, let alone the heretofore constitutional minimum of reasonable suspicion, a result that permits search and seizure to rest upon "nothing more substantial than inarticulate hunches." This defacement of Fourth Amendment protections is arrived at by a balancing process that overwhelms the individual's protection against unwarranted official intrusion by a governmental interest said to justify the search and seizure. But that method is only a convenient cover for condoning arbitrary official conduct, for the governmental interests relied on as warranting intrusion here are the same as those in *Almeida-Sanchez* and *Ortiz,* which required a showing of probable cause for roving-patrol and fixed checkpoint searches, and *Brignoni-Ponce,* which required at least a showing of reasonable suspicion based on specific articulable facts to justify roving-patrol stops. Absent some difference in the nature of the intrusion, the same minimal requirement should be imposed for checkpoint stops.

The Court assumes, and I certainly agree, that persons stopped at fixed checkpoints, whether or not referred to a secondary detention area, are "seized" within the meaning of the Fourth Amendment. Moreover, since the vehicle and its occupants are subjected to a "visual inspection," the intrusion clearly exceeds mere physical restraint, for officers are able to see more in a stopped vehicle than in vehicles traveling at normal speeds down the highway. As the Court concedes, *ante,* at 558, the checkpoint stop involves essentially the same intrusions as a roving-patrol stop, yet the Court provides no principled basis for distinguishing checkpoint stops.

Certainly that basis is not provided in the Court's reasoning that the subjective intrusion here is appreciably less than in the case of a stop by a roving patrol.

*Brignoni-Ponce* nowhere bases the requirement of reasonable suspicion upon the subjective nature of the intrusion. In any event, the subjective aspects of checkpoint stops, even if different from the subjective aspects of roving-patrol stops, just as much require some principled restraint on law enforcement conduct. The motorist whose conduct has been nothing but innocent—and this is overwhelmingly the case—surely resents his own detention and inspection. And checkpoints, unlike roving stops, detain thousands of motorists, a dragnet-like procedure offensive to the sensibilities of free citizens. Also, the delay occasioned by stopping hundreds of vehicles on a busy highway is particularly irritating.

In addition to overlooking these dimensions of subjective intrusion, the Court, without explanation, also ignores one major source of vexation. In abandoning any requirement of a minimum of reasonable suspicion, or even articulable suspicion, the Court in every practical sense renders meaningless, as applied to checkpoint stops, the *Brignoni-Ponce* holding that "standing alone [Mexican appearance] does not justify stopping all Mexican-Americans to ask if they are aliens."[1] 422

---

[1] *Brignoni-Ponce,* which involved roving-patrol stops, said: "[Mexican ancestry] alone would justify neither a reasonable belief that they were aliens, nor a reasonable belief that the car concealed other aliens who were illegally in the country. Large numbers of native-born and naturalized citizens have the physical characteristics identified with Mexican ancestry, and even in the border area a relatively small proportion of them are aliens. The likelihood that any given person of Mexican ancestry is an alien is high enough to make Mexican appearance a relevant factor, but standing alone it does not justify stopping all Mexican-Americans to ask if they are aliens." 422 U. S., at 886–887 (footnote omitted).

Today we are told that secondary referrals may be based on criteria that would not sustain a roving-patrol stop, and specifically that such referrals may be based largely on Mexican ancestry. *Ante,* at 563. Even if the difference between *Brignoni-Ponce* and

U. S., at 887. Since the objective is almost entirely the Mexican illegally in the country, checkpoint officials, uninhibited by any objective standards and therefore free to stop any or all motorists without explanation or excuse, wholly on whim, will perforce target motorists of Mexican appearance. The process will then inescapably discriminate against citizens of Mexican ancestry and Mexican aliens lawfully in this country for no other reason than that they unavoidably possess the same "suspicious" physical and grooming characteristics of illegal Mexican aliens.

Every American citizen of Mexican ancestry and every Mexican alien lawfully in this country must know after today's decision that he travels the fixed checkpoint highways at the risk of being subjected not only to a stop, but also to detention and interrogation, both prolonged and to an extent far more than for non-Mexican appearing motorists. To be singled out for referral and to be detained and interrogated must be upsetting to any motorist. One wonders what actual experience supports my Brethren's conclusion that referrals "should not be frightening or offensive because of their public and relatively routine nature." *Ante,* at 560.[2] In point of fact, refer-

---

this decision is only a matter of degree, we are not told what justifies the different treatment of Mexican appearance or why greater emphasis is permitted in the less demanding circumstances of a checkpoint. That law in this country should tolerate use of one's ancestry as probative of possible criminal conduct is repugnant under any circumstances.

[2] The Court's view that "selective referrals—rather than questioning the occupants of every car—tend to advance some Fourth Amendment interests by minimizing the intrusion on the general motoring public," *ante,* at 560, stands the Fourth Amendment on its head. The starting point of this view is the unannounced assumption that intrusions are generally permissible; hence, any minimization of intrusions serves Fourth Amendment interests. Under the Fourth Amendment, however, the status quo is nonintrusion, for as

rals, viewed in context, are not relatively routine; thousands are otherwise permitted to pass. But for the arbitrarily selected motorists who must suffer the delay and humiliation of detention and interrogation, the experience can obviously be upsetting.[3] And that experience is particularly vexing for the motorist of Mexican ancestry who is selectively referred, knowing that the officers' target is the Mexican alien. That deep resentment will be stirred by a sense of unfair discrimination is not difficult to foresee.[4]

---

a general matter, it is unreasonable to subject the average citizen or his property to search or seizure. Thus, minimization of intrusion only lessens the aggravation to Fourth Amendment interests; it certainly does not further those interests.

[3] *United States* v. *Ortiz*, 422 U. S. 891 (1975), expressly recognized that such selectivity is a source of embarrassment: "Nor do checkpoint procedures significantly reduce the likelihood of embarrassment. Motorists whose cars are searched, unlike those who are only questioned, may not be reassured by seeing that the Border Patrol searches others cars as well." *Id.,* at 895.

[4] Though today's decision would clearly permit detentions to be based solely on Mexican ancestry, the Court takes comfort in what appears to be the Border Patrol practice of not relying on Mexican ancestry standing alone in referring motorists for secondary detentions. *Ante,* at 563 n. 16. See also *ante,* at 566–567, n. 19. Good faith on the part of law enforcement officials, however, has never sufficed in this tribunal to substitute as a safeguard for personal freedoms or to remit our duty to effectuate constitutional guarantees. Indeed, with particular regard to the Fourth Amendment, *Terry* v. *Ohio,* 392 U. S. 1, 22 (1968), held that "simple ' "good faith on the part of the arresting officer is not enough." . . . If subjective good faith alone were the test, the protections of the Fourth Amendment would evaporate, and the people would be "secure in their persons, houses, papers, and effects," only in the discretion of the police.' *Beck* v. *Ohio,* [379 U. S. 89,] 97 [1964]."

Even if good faith is assumed, the affront to the dignity of American citizens of Mexican ancestry and Mexican aliens lawfully within the country is in no way diminished. The fact still remains that people of Mexican ancestry are targeted for examination at

In short, if a balancing process is required, the balance should be struck, as in *Brignoni-Ponce,* to require that Border Patrol officers act upon at least reasonable suspicion in making checkpoint stops. In any event, even if a different balance were struck, the Court cannot, without ignoring the Fourth Amendment requirement of reasonableness, justify wholly unguided seizures by officials manning the checkpoints. The Court argues, however, that practicalities necessitate otherwise: "A requirement that stops on major routes inland always be based on reasonable suspicion would be impractical because the flow of traffic tends to be too heavy to allow the particularized study of a given car that would enable it to be identified as a possible carrier of illegal aliens." *Ante,* at 557.

As an initial matter, whatever force this argument may have, it cannot apply to the secondary detentions that occurred in No. 74–1560. Once a vehicle has been slowed and observed at a checkpoint, ample opportunity

---

checkpoints and that the burden of checkpoint intrusions will lie heaviest on them. That, as the Court observes, *ante,* at 563 n. 16, "[l]ess than 1% of the motorists passing the checkpoint are stopped for questioning," whereas approximately 16% of the population of California is Spanish-speaking or of Spanish surname, has little bearing on this point—or, for that matter, on the integrity of Border Patrol practices. There is no indication how many of the 16% have physical and grooming characteristics identifiable as Mexican. There is no indication what portion of the motoring public in California is of Spanish or Mexican ancestry. Given the socioeconomic status of this portion, it is likely that the figure is significantly less than 16%. Neither is there any indication that those of Mexican ancestry are not subjected to lengthier initial stops than others, even if they are not secondarily detained. Finally, there is no indication of the ancestral makeup of the 1% who are referred for secondary detention. If, as is quite likely the case, it is overwhelmingly Mexican, the sense of discrimination which will be felt is only enhanced.

exists to formulate the reasonable suspicion which, if it actually exists, would justify further detention. Indeed, though permitting roving stops based on reasonable suspicion, *Brignoni-Ponce* required that "any further detention or search must be based on [the greater showing of] consent or probable cause." 422 U. S., at 882. The Court today, however, does not impose a requirement of even reasonable suspicion for these secondary stops.

The Court's rationale is also not persuasive because several of the factors upon which officers may rely in establishing reasonable suspicion are readily ascertainable, regardless of the flow of traffic. For example, with checkpoint stops as with roving-patrol stops, "[a]spects of the vehicle itself may justify suspicion." *Id.*, at 885. Thus it is relevant that the vehicle is a certain type of station wagon, appears to be heavily loaded, contains an extraordinary number of persons, or contains persons trying to hide. See *ibid.* If such factors are satisfactory to permit the imposition of a reasonable-suspicion requirement in the more demanding circumstances of a roving patrol, where officers initially deal with a vehicle traveling, not at a crawl, but at highway speeds, they clearly should suffice in the circumstances of a checkpoint stop.

Finally, the Court's argument fails for more basic reasons. There is no principle in the jurisprudence of fundamental rights which permits constitutional limitations to be dispensed with merely because they cannot be conveniently satisfied. Dispensing with reasonable suspicion as a prerequisite to stopping and inspecting motorists because the inconvenience of such a requirement would make it impossible to identify a given car as a possible carrier of aliens is no more justifiable than dispensing with probable cause as prerequisite to the search of an individual because the inconvenience of

such a requirement would make it impossible to identify a given person in a high-crime area as a possible carrier of concealed weapons. "The needs of law enforcement stand in constant tension with the Constitution's protections of the individual against certain exercises of official power. It is precisely the predictability of these pressures that counsels a resolute loyalty to constitutional safeguards." *Almeida-Sanchez* v. *United States,* 413 U. S., at 273.

The Court also attempts to justify its approval of standardless conduct on the ground that checkpoint stops "involve less discretionary enforcement activity" than roving stops. *Ante,* at 559. This view is at odds with its later more revealing statement that "officers must have wide discretion in selecting the motorists to be diverted for the brief questioning involved." *Ante,* at 564. Similarly unpersuasive is the statement that "since field officers may stop only those cars passing the checkpoint, there is less room for abusive or harassing stops of individuals than there was in the case of roving-patrol stops." *Ante,* at 559.[5] The Fourth Amendment stand-

---

[5] As an empirical proposition, this observation is hardly self-evident. No small number of vehicles pass through a checkpoint. Indeed, better than 1,000 pass through the San Clemente checkpoint during each hour of operation. *Ante,* at 554. Thus there is clearly abundant opportunity for abuse and harassment at checkpoints through lengthier detention and questioning of some individuals or arbitrary secondary detentions. Such practices need not be confined to those of Mexican ancestry. And given that it is easier to deal with a vehicle which has already been slowed than it is to observe and then chase and apprehend a vehicle travelling at highway speeds, if anything, there is more, not less, room for abuse or harassment at checkpoints. Indeed, in *Ortiz,* the Court was "not persuaded that the checkpoint limits to any meaningful extent the officer's discretion to select cars for search." 422 U. S., at 895. *A fortiori,* discretion can be no more limited simply because the activity is detention or questioning rather than searching.

ard of reasonableness admits of neither intrusion at the discretion of law enforcement personnel nor abusive or harassing stops, however infrequent. Action based merely on whatever may pique the curiosity of a particular officer is the antithesis of the objective standards requisite to reasonable conduct and to avoiding abuse and harassment. Such action, which the Court now permits, has expressly been condemned as contrary to basic Fourth Amendment principles. Certainly today's holding is far removed from the proposition emphatically affirmed in *United States* v. *United States District Court,* 407 U. S. 297, 317 (1972), that "those charged with . . . investigative and prosecutorial duty should not be the sole judges of when to utilize constitutionally sensitive means in pursuing their tasks. The historical judgment, which the Fourth Amendment accepts, is that unreviewed executive discretion may yield too readily to pressures to obtain incriminating evidence and overlook potential invasions of privacy . . . ." Indeed, it is far removed from the even more recent affirmation that "the central concern of the Fourth Amendment is to protect liberty and privacy from arbitrary and oppressive interference by government officials." *United States* v. *Ortiz,* 422 U. S., at 895.[6]

---

[6] *Camara* v. *Municipal Court,* 387 U. S. 523 (1967), does not support the Court's result. Contrary to the Court's characterization, *ante,* at 561, the searches condoned there were not "routine intrusions." The Court required that administrative searches proceed according to reasonable standards satisfied with respect to each particular dwelling searched. 387 U. S., at 538. The search of any dwelling at the whim of administrative personnel was not permitted. The Court, however, imposes no such standards today. Instead, any vehicle and its passengers are subject to detention at a fixed checkpoint, and "no particularized reason need exist to justify" the detention. *Ante,* at 563. To paraphrase an apposite observation by the Court in *Almeida-Sanchez* v. *United States,* 413 U. S. 266, 270 (1973), "[checkpoints] thus embodied precisely the

The cornerstone of this society, indeed of any free society, is orderly procedure. The Constitution, as originally adopted, was therefore, in great measure, a procedural document. For the same reasons the drafters of the Bill of Rights largely placed their faith in procedural limitations on government action. The Fourth Amendment's requirement that searches and seizures be reasonable enforces this fundamental understanding in erecting its buffer against the arbitrary treatment of citizens by government. But to permit, as the Court does today, police discretion to supplant the objectivity of reason and, thereby, expediency to reign in the place of order, is to undermine Fourth Amendment safeguards and threaten erosion of the cornerstone of our system of a government, for, as Mr. Justice Frankfurter reminded us, "[t]he history of American freedom is, in no small measure, the history of procedure." *Malinski* v. *New York,* 324 U. S. 401, 414 (1945).

evil the Court saw in *Camara* when it insisted that the 'discretion of the official in the field' be circumscribed . . . ."