UNITED STATES of America, Plaintiff,

v.

Shawn Louis HAYDEN and Sandra
Faye Jefferson, Defendants.

Cr. No. 89–39.

United States District Court,
S.D. Iowa.

June 20, 1989.

Ronald M. Kayser, Asst. U.S. Atty., Des Moines, Iowa, for plaintiff.

Robert J. Kromminga, Des Moines, Iowa, for Hayden.

Kenneth Meshbesher, Minneapolis, Minn., and Thomas G. Keiderling, Des Moines, Iowa, for Jefferson.

## MEMORANDUM OPINION, RULING AND ORDERS

VIETOR, Chief Judge.

I heard defendants' motions to suppress on the 9th and 12th days of June 1989. The defendants, who are charged in a one count indictment with knowingly and intentionally possessing with intent to distribute approximately nine kilograms of cocaine in violation of Title 21, United States Code, section 841(a)(1), seek suppression of physical evidence seized in the search of a motor vehicle and statements made by them, and defendant Hayden seeks return of cash taken from him.

### FINDINGS OF FACT

On March 28, 1989, defendant Hayden was in Minneapolis, Minnesota, where he resides. He was asked by another person to drive to Omaha, Nebraska, to pick up defendant Jefferson and return her to Minneapolis. To carry out this mission, he needed to rent a car. Because Hayden did not have a major credit card to aid him in renting a car, he asked a friend, Prestley Johnson, to rent a car for him. Early that evening, the two drove to the Minneapolis/St. Paul airport and Johnson rented a Mercury Cougar from Budget Rent/A/Car. The rental agreement listed Johnson as the renter but neither Hayden nor any other person was listed as an authorized additional driver.

Hayden then took the rental car and drove to Omaha, Nebraska, where he

picked up Jefferson at the bus station at 4:00 a.m. on March 29. She had two suitcases which Hayden put in the trunk of the car. Defendants then began travelling back to Minneapolis with Hayden driving and Jefferson in the front passenger seat. They travelled east on Interstate 80. It became foggy, so Hayden pulled into an interstate rest area just west of Des Moines. He went to the restroom and then got back into the driver's seat of the car, started the engine because the weather was cold, and tilted the seat part way back to rest while waiting for the fog to lift.

At about 6:35 to 6:40 a.m., David Pettengill, Iowa Highway Patrol trooper, drove into the rest area to make a routine check. He saw the Cougar with its motor running and two people in it. He also noticed a rental car decal and the Minnesota license plates on the vehicle. He stopped his patrol vehicle behind the Cougar. Trooper Pettengill testified that his purpose was to make a "welfare check"—that is, check on the welfare of the occupants of the car. Before he approached the car and its occupants, however, he radioed the license plate number to the dispatcher and got a report back that the car was registered to a car rental company at the Minneapolis/St. Paul airport, and he also called for "back-up"—that is, for another trooper to come to aid him. This took a couple minutes' time, and it was not until this was done that the trooper went to the driver's window of the Cougar. I find that his concern, if any, for the welfare of the occupants was secondary to his real reason for approaching the defendants, which was that he was somewhat suspicious that something illegal was afoot. The only reason Trooper Pettengill articulated for being suspicious at that time was that the Cougar was a rental car from the Minneapolis/St. Paul airport.

Trooper Pettengill, who was in uniform and armed, approached the car and tapped on the driver's window, awakening the defendants. He asked to see Hayden's driver's license and Hayden gave it to him. He asked Jefferson for ID and she gave him some. He asked Hayden if the vehicle was a rental car, and Hayden replied that it was. He asked Hayden to see the rental agreement, which Hayden gave him. He kept possession of Hayden's license, Jefferson's ID and the rental agreement and asked Hayden to accompany him to the patrol car, which Hayden did. Trooper Pettengill then checked with the dispatcher to see if there were any outstanding warrants for Hayden or Jefferson and learned that there were none. He asked Hayden where he was coming from and going to and Hayden told him. The trooper noticed that the rental agreement named Prestley Johnson as the renter and that neither Hayden nor Jefferson nor anybody else was listed as an authorized additional driver. Hayden told him that Johnson had rented the car so that he, Hayden, could go to Omaha to get Jefferson. The trooper went back to the rental vehicle and spoke with Jefferson, who said they had not been anywhere in particular and were not going anywhere in particular. The trooper asked her if she knew Johnson, and she said she did not.

Trooper Pettengill then returned to his patrol car and called the dispatcher to have the dispatcher contact Budget. By this time, the trooper wanted to search the car for drugs. He asked Hayden for permission to search the car, but Hayden refused. Hayden asked the trooper for permission to go to the bathroom, but the trooper refused. Hayden asked the trooper why they were being detained and he replied: "I'm just on a fishing expedition." In the meantime, a back-up trooper arrived and later a patrol sergeant arrived.

The efforts to contact Budget began about 6:55 a.m. Ultimately, about 7:21 a.m., the dispatcher spoke with the Budget manager on duty at the Minneapolis/St. Paul airport, Tim Ogren. In the dispatcher's communications with Ogren, the dispatcher was clearly speaking in a manner so as to encourage Ogren to authorize a seizure of the Cougar. In fact, Ogren was misinformed that both Hayden and Jefferson stated that they did not know Johnson. The dispatcher suggested to Ogren that he

telephone Johnson but then, before Johnson was called, the dispatcher asked Ogren: "Can we arrest these people for a stolen vehicle?" Ogren said he would first like to speak to Johnson. Ogren called Johnson, who replied that although he knew Hayden and Jefferson, he "didn't know they'd be taking my car." Ogren told Johnson he would have the car impounded, and after pausing, Johnson said: "Yes." The dispatcher told Ogren that "we might think it's a drug related type of thing now." Ogren then said "grab the car definitely." He then reaffirmed that the patrol should "tow it in." The dispatcher so advised the troopers at the scene; this was about 7:40 a.m.

The rental agreement expressly provided that the vehicle could be repossessed if it was used in violation of the rental agreement, and the rental agreement prohibited the vehicle from being driven by anybody except the renter and any additional driver named on the agreement.

The troopers advised the defendants that they were going to impound the car and that they could retrieve their personal property from the car. The defendants did retrieve items of personal property from the passenger compartment. Neither defendant stated that there was personal property in the trunk and they did not ask to retrieve any personal property other than that which they retrieved from the passenger compartment. The troopers told the defendants that they would be transported to a bus station.

The troopers impounded the vehicle and searched it, purportedly as an "inventory search." They opened the trunk and found the two suitcases. They opened the suitcases and in one suitcase they found nine kilograms of cocaine, which they seized.

The defendants were then arrested for operating a motor vehicle without the owner's consent. (At that time, the troopers, although they believed that the nine kilograms of substance was cocaine, did not have any kind of analysis of the substance.)

## CONCLUSIONS OF LAW AND DISCUSSION

The Fourth Amendment to the United States Constitution, which applies to the states through the Fourteenth Amendment, provides: "The right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated * * *."

The threshold issue to be resolved is whether there was an unreasonable seizure of defendants within the meaning of the Fourth Amendment when Trooper Pettengill approached defendants in the Cougar and required Hayden to produce his driver's license and the rental agreement and Jefferson to produce identification.

In *Delaware v. Prouse,* 440 U.S. 648, 663, 99 S.Ct. 1391, 1401, 59 L.Ed.2d 660 (1979), the Supreme Court held:

Accordingly, we hold that except in those situations in which there is at least articulable and reasonable suspicion that a motorist is unlicensed or that an automobile is not registered, or that either the vehicle or an occupant is otherwise subject to seizure for violation of law, stopping an automobile and detaining the driver in order to check his driver's license and the registration of the automobile are unreasonable under the Fourth Amendment.

The court in *Prouse* initially noted that stopping an automobile and detaining its occupants constitute a "seizure" within the meaning of [the Fourth Amendment], even though the purpose of the stop is limited and the resulting detention quite brief. *United States v. Martinez–Fuerte,* 428 U.S. 543, 556–558, 96 S.Ct. 3074, 3082–3083, 49 L.Ed.2d 1116 (1976); *United States v. Brignoni–Ponce,* 422 U.S. 873, 878, 95 S.Ct. 2574, 2578, 45 L.Ed.2d 607 (1975); cf. *Terry v. Ohio,* 392 U.S. 1, 16, 88 S.Ct. 1868, 1877, 20 L.Ed.2d 889 (1968).

*Id.* 440 U.S. at 653, 99 S.Ct. at 1396.

In the instant case the defendants were not stopped by Trooper Pettengill because they were already stopped at a rest stop on the interstate when he came on the scene. That fact, however, does not mean

that there was not a seizure within the meaning of the Fourth Amendment. When an automobile is moving it must first be stopped before its occupants can be detained to show documents. Stopping the vehicle is necessarily a part of the seizure process when the vehicle is moving, but only a part of it. The heart of the seizure process is the detention of the people in the vehicle while the documents are requested, produced and examined. That type of seizure, even though brief in duration and for a limited purpose, occurs whether or not it was first necessary for the officer to stop the vehicle. In either case, the occupants of the vehicle are not free to drive away or walk away or otherwise carry on with their activities (resting, for instance) until the detention has ended. Therefore, it is my conclusion that when Trooper Pettengill went up to the Cougar and required Hayden to produce his driver's license and the rental agreement and Jefferson to produce her identification, the defendants were seized within the meaning of the Fourth Amendment.

■ Was this seizure unreasonable under the Fourth Amendment? I conclude that it was. Defendants were lawfully parked at a rest stop. There was no indication that Hayden was unlicensed, or that the car was not registered,[1] or that it was illegally parked or that any other traffic violations had been committed, were being committed or were about to be committed. As mentioned in the findings of fact, Trooper Pettengill was suspicious that something illegal was taking place, but the only reason he articulated for his suspicions was that the Cougar was a rental car registered to a car rental company at the Minneapolis/St. Paul airport, which I judicially note is about a 4½ hour drive from

the scene. I simply cannot conclude that a rental car being on an interstate 4½ hours from its place of rental is a fact that can give rise to a *reasonable* suspicion that the driver was unlicensed or that some other criminal mischief was afoot. (Defendants suggest that Trooper Pettengill was suspicious because they are black, but that is mere surmise because there is no evidence that their race influenced him. In any event, defendants' race would provide no basis for a reasonable suspicion, and it would be fundamentally wrong for an officer to act, even in small part, on the basis of a motorist's race.) Because the seizure was not based on any articulable and reasonable suspicion, it was unreasonable, and therefore it was in violation of the Fourth Amendment.[2]

In essence, motorists in these United States have the same Fourth Amendment right at rest stops as they have on the highway to be free from document inspection detention absent reasonable suspicion.

All of the physical evidence and the statements of the defendants obtained after this initial unreasonable seizure is tainted by the seizure—it is all fruit of the poisonous tree—and therefore is not admissible into evidence. The motions to suppress must be sustained.[3]

## RULING AND ORDERS

Defendants' motions to suppress are granted, and IT IS ORDERED that at the trial of this case the government shall not be allowed to introduce into evidence any of the physical evidence seized at the rest stop on March 29, 1989, or any of the statements made by defendants on that date. IT IS FURTHER ORDERED that

---

1. When Trooper Pettengill approached the Cougar, he already knew from checking with the dispatcher that the car was registered to a rental company.

2. The seizure would not be reasonable even if Trooper Pettengill's primary purpose in approaching defendants was to check on their welfare. He could do that without additionally detaining them to examine documents. The cause for making a welfare check (defendants apparently sleeping in the car with the motor

running) would not create a reasonable suspicion that Hayden was unlicensed or that there was some other criminal violation.

3. I recently upheld admissibility of seized evidence in a somewhat similar case, *United States v. Deziel,* Criminal No. 89–37. That case, however, is distinguishable. Conduct of the defendants at the rest stop scene created a reasonable suspicion, and the subsequent search was made with the express and voluntary consent of one of the defendants.

cash taken from defendant Hayden at the time of his arrest be returned to him.