[Cite as *State v. Hall*, 2011-Ohio-5096.]

COURT OF APPEALS
STARK COUNTY, OHIO
FIFTH APPELLATE DISTRICT

|  |  |  |
|---|---|---|
|  | : | JUDGES: |
| STATE OF OHIO | : | W. Scott Gwin, P.J. |
|  | : | John W. Wise, J. |
| Plaintiff-Appellee | : | Julie A. Edwards, J. |
|  | : |  |
| -vs- | : | Case No. 2011CA00032 |
|  | : |  |
|  | : |  |
| GERALD R. HALL | : | O P I N I O N |
| Defendant-Appellant |  |  |


CHARACTER OF PROCEEDING:     Criminal Appeal from Stark County
                             Court of Common Pleas Case No.
                             2010CR1330

JUDGMENT:                    Affirmed

DATE OF JUDGMENT ENTRY:      September 26, 2011

APPEARANCES:

For Plaintiff-Appellee                For Defendant-Appellant

JOHN D. FERRERO                       KRISTINA R. POWERS
Prosecuting Attorney                  Stark County Public Defender's Office
Stark County, Ohio                    200 W. Tuscarawas Street, Ste. 200
                                      Canton, Ohio  44702
BY: RONALD MARK CALDWELL
Assistant Prosecuting Attorney
Appellate Section
110 Central Plaza, South – Suite 510
Canton, Ohio  44702-1413

*Edwards, J.*

{¶1}   Appellant, Gerald Hall, appeals a judgment of the Stark County Common Pleas Court convicting him of possession of cocaine (R.C. 2925.11(A)(C)(4)(b)) upon a plea of no contest and sentencing him to three years community control.  Appellee is the State of Ohio.

<u>STATEMENT OF FACTS AND CASE</u>

{¶2}   Detective Mike Volpe has been a Canton Police officer for five years.  He was assigned to the FBI Task Force, which investigates violent crime, bank robberies and gang activity.

{¶3}   In the late morning hours of August 30, 2010, Det. Volpe and two special agents were investigating a bank robbery.  The robbery occurred on August 28, 2010, and was believed to be connected to the Rated R street gang.  The Victory Square apartment complex, located on 8th St. NE in Canton, is operated by the Stark Metropolitan Housing Authority and known to be heavily populated with Rated R gang members.  The apartment complex is a high crime area, known for both violent crime and drug activity.  Det. Volpe and the other agents planned to walk around the area in plain clothes, seeking to obtain information about the bank robbery from anyone who would cooperate with them.

{¶4}   After exiting his unmarked vehicle, Det. Volpe saw appellant standing within the fenced-in area of Victory Square.  He approached appellant, who he recognized from prior incidents.  He identified himself as a police officer and told appellant he would like to talk to him.  According to Volpe, if appellant had run from him, he would have chased him.  However, if appellant had walked away, he would have

tried to engage appellant in conversation but would have let appellant go if appellant continued to "blow him off."

{¶5} Volpe told appellant he wanted to talk to him about the bank robbery and wanted to pat him down for safety before speaking with him. According to Volpe, appellant consented to the pat down and agreed to allow the officer to search his pants' pockets. Det. Volpe felt a large lump in a pocket, but nothing was inside the pants pocket. He noticed that appellant had a pair of shorts on under his pants, and asked if he could search the pockets of the shorts. Appellant again consented. Det. Volpe found crack cocaine in the pocket of appellant's shorts.

{¶6} While being transported to the police station after his arrest for possession of cocaine, appellant stated that he wanted to do something to "work off" the charges. At the station he was read his *Miranda* rights by Special Agent Mike Jones. Although Volpe did not remember if appellant expressly waived his rights, appellant continued to talk with officers after stating that he understood his rights.

{¶7} Appellant was indicted by the Stark County Grand Jury with one count of possession of cocaine. He moved to suppress the cocaine and the statement he made to police.[1] The court conducted a suppression hearing. Det. Volpe was the only witness who testified at the hearing. The court found that appellant was not "seized" within the meaning of the Fourth Amendment, and that he was searched with his consent. The court further found that appellant was read his *Miranda* rights and proceeded to give a statement. The court overruled the motion to suppress in its entirety.

---

[1] The State maintains the statement made by appellant, essentially trying to work with police to obtain dismissal of the charge, is not essential to the instant prosecution.

{¶8}   Appellant then entered a plea of no contest.  He was convicted as charged and sentenced to three years community control.  He assigns a single error on appeal:

{¶9}   "THE TRIAL COURT ERRED WHEN IT DENIED APPELLANT'S MOTION TO SUPPRESS EVIDENCE."

{¶10}  There are three methods of challenging on appeal a trial court's ruling on a motion to suppress. First, an appellant may challenge the trial court's findings of fact. In reviewing a challenge of this nature, an appellate court must determine whether said findings of fact are against the manifest weight of the evidence. *State v. Fanning* (1982), 1 Ohio St.3d 19, 437 N.E.2d 583; *State v. Klein* (1991), 73 Ohio App.3d 486, 597 N.E.2d 1141; *State v. Guysinger* (1993), 86 Ohio App.3d 592, 621 N.E.2d 726. Second, an appellant may argue the trial court failed to apply the appropriate test or correct law to the findings of fact. In that case, an appellate court can reverse the trial court for committing an error of law. *State v. Williams* (1993), 86 Ohio App.3d 37, 619 N.E.2d 1141. Finally, assuming the trial court's findings of fact are not against the manifest weight of the evidence and it has properly identified the law to be applied, an appellant may argue the trial court has incorrectly decided the ultimate or final issue raised in the motion to suppress. When reviewing this type of claim, an appellate court must independently determine, without deference to the trial court's conclusion, whether the facts meet the appropriate legal standard in any given case. *State v. Curry* (1994), 95 Ohio App.3d 93, 641 N.E.2d 1172; *State v. Claytor* (1993), 85 Ohio App.3d 623, 620 N.E.2d 906; *Guysinger.* As the United States Supreme Court held in *Ornelas v. U.S.* (1996), 517 U.S. 690, 116 S.Ct. 1657, 1663, 134 L.Ed.2d 911, "... as a general matter

determinations of reasonable suspicion and probable cause should be reviewed *de novo* on appeal."

**{¶11}** When ruling on a motion to suppress, the trial court assumes the role of trier of fact and is in the best position to resolve questions of fact and to evaluate the credibility of witnesses. See *State v. Dunlap,* 73 Ohio St.3d 308, 314, 1995–Ohio–243, 652 N.E.2d 988; *State v. Fanning* (1982), 1 Ohio St.3d 19, 20, 437 N.E.2d 583.

**{¶12}** Appellant first argues that he was "stopped" without a reasonable, articulable suspicion of criminal activity as required by *Terry v. Ohio* (1968), 392 U.S.1. The trial court found that the encounter was consensual and not a "stop" for which police were required to have a suspicion of criminal activity.

**{¶13}** The United States Supreme Court has held that not every contact between police and citizens constitutes a seizure:

**{¶14}** "The Fourth Amendment does not proscribe all contact between the police and citizens, but is designed 'to prevent arbitrary and oppressive interference by enforcement officials with the privacy and personal security of individuals.' *United States v. Martinez–Fuerte*, 428 U.S. 543, 554, 96 S.Ct. 3074, 3081, 49 L.Ed.2d 1116 (1976). Given the diversity of encounters between police officers and citizens, however, the Court has been cautious in defining the limits imposed by the Fourth Amendment on encounters between the police and citizens. As we have noted elsewhere: 'Obviously, not all personal intercourse between policemen and citizens involves 'seizures' of persons. Only when the officer, by means of physical force or show of authority, has restrained the liberty of a citizen may we conclude that a 'seizure' has occurred.' *Terry v. Ohio*, supra, 392 U.S., at 19, n. 16, 88 S.Ct., at 1879 n. 16. While applying such a test

is relatively straightforward in a situation resembling a traditional arrest, see *Dunaway v. New York*, 442 U.S. 200, 212–216, 99 S.Ct. 2248, 2256–2258, 60 L.Ed.2d 824 (1979), the protection against unreasonable seizures also extends to 'seizures that involve only a brief detention short of traditional arrest.' *United States v. Brignoni–Ponce*, 422 U.S. 873, 878, 95 S.Ct. 2574, 2578, 45 L.Ed.2d 607 (1975). What has evolved from our cases is a determination that an initially consensual encounter between a police officer and a citizen can be transformed into a seizure or detention within the meaning of the Fourth Amendment, 'if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.' *Mendenhall*, supra, 446 U.S. at 554, 100 S.Ct., at 1877 (footnote omitted); see *Florida v. Royer*, 460 U.S. 491, 502, 103 S.Ct. 1319, 1326, 75 L.Ed.2d 229 (1983) (plurality opinion)." *INS v. Delgado* (1984), 466 U.S. 210, 215.

**{¶15}** The United States Supreme Court has recently noted that officers may seek consent-based encounters if they are lawfully present in the place where the consensual encounter occurs. *Kentucky v. King* (2011), ___ U.S. ___, 131 S. Ct. 1849, 1858, 179 L.Ed.2d 865. If consent is freely given, it makes no difference that an officer may have approached the person with the hope or expectation of obtaining consent. Id. While most citizens will respond to a police request, the fact that people do so, and do so without being told they are free not to respond, does not eliminate the consensual nature of the response. Id.

**{¶16}** Appellant argues that he had limited means of walking away, as he was stopped against a fence line, there were buildings on either side of him and the fourth side was blocked by vehicles in the parking lot. He argues there was a small opening at

the end of the fence, but Volpe testified that he would have pursued him had he attempted to flee.

{¶17} Volpe testified that appellant could have exited through the opening in the fence or he could have gone inside the building. While he did testify that he would have pursued appellant if he ran, he did not testify that he would have restrained appellant had he walked away. He testified that he would have continued to try to engage appellant in conversation, but if appellant continued to blow him off, he would have let him go. Volpe approached appellant just to talk to him, appellant was not a suspect in the robbery although he was known to associate with members of the Rated R street gang. The plan of the officers was to talk to whoever they might run into to gain information. Because the officer testified that appellant would not have been detained had he walked away and appellant had a method to walk away had he chosen to do so, the court found he was not seized. The court did not err in this finding based on the evidence presented at the hearing.

{¶18} Appellant next argues that the court erred in finding the search was consensual. He argues that he was informed he was going to be patted down, and therefore did not consent.

{¶19} The question of whether consent to search was voluntary or the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of the circumstances. *Schneckcloth v. Bustamonte* (1973), 412 U.S. 218, 227, 93 S.Ct. 2041, 36 L.Ed.2d 854. The standard for measuring the scope of consent is objective reasonableness, i.e., what a reasonable person would have understood by the

exchange between the officer and the suspect.  *Florida v. Jimeno* (1991), 500 U.S.248, 251, 111 S.Ct. 1801, 114 L.E.2d 297.

{¶20}  Det. Volpe's testimony on the issue of consent to the pat down is less than crystal clear.  However, he testified as follows on the issue of consent to both the initial patdown and the search of appellant's pants and shorts pockets:

{¶21}  "For officer safety purposes only I advised him prior to talking to him that I was going to pat him down for weapons to insure officer safety and also the safety of Mr. Hall.

{¶22}  "He consented to the patdown.  I also asked him if he had anything illegal on him at that time, specifically guns or weapons.  He stated no.  I asked consent to search his persons and he did give consent to search his persons.  I specifically asked him for his pants pocket - - to patdown his or search his pant pockets.  He consented to the search."  Tr. 11.

{¶23}  "Q. And then you stated that - - so you had consent to search his pants pockets.  So when you felt the lump did you ask at that point to search the shorts?

{¶24}  "A. Yes.  After I found the large lump I checked his pant pockets.  There was nothing in the pant pockets, but I could still feel the large lump and he said - - we noticed that he had a pair of shorts on underneath of that.  He was sagging his pants, which is a normal trend for young adults.

{¶25}  "So because of his pants sagging you could tell he had another pair of - - they weren't boxer shorts.  They weren't underwear.  You could tell it was definitely either - - another pair of pants or a pair of shorts on underneath.  He stated yes.  I asked if he had pockets in those shorts.  He said yes.  Then I asked consent again for the

short - - for his short pockets because I could still feel that large lump in that area.  He consented to searching the pockets of his shorts." Tr. 13-14.

**{¶26}** "Q. Now, you said that after you say to him I'm going to pat you down for officer safety you basically say is that okay with you?

**{¶27}** "A. Correct.

**{¶28}** "Q. Can you tell me how you said that to him?

**{¶29}** "A. Probably just as simple as you just did it to me.

**{¶30}** "Q. Okay.  And how did he consent?

**{¶31}** "A. He said - - he may have said okay or that's fine.

**{¶32}** "Q. Do you remember?

**{¶33}** "A. No, I don't…

**{¶34}** "Q. So you don't recall what he did to consent?

**{¶35}** "A. No.  And prior to patting him down I also asked consent to search his persons and he consented to that.

**{¶36}** "Q. How?

**{¶37}** "A. By saying yes.

**{¶38}** "Q. You specifically recall him saying yes?

**{¶39}** "A. Yes, because I asked him if that was okay and he said yes.

**{¶40}** "Q. Well, if he had consented initially when you felt the lump why did you ask him to consent the second time?

**{¶41}** "A. Because he had a second pair of shorts on.  I wanted to make sure that he didn't have a problem with me going into his other pair of pants.

**{¶42}** "Q. So you asked consent for each layer of clothing?

{¶43} "A. I did that day, yes, I did." Tr. 28-29.

{¶44} As noted earlier, the trial court is in the best position to determine the credibility of witnesses. *Dunlap*, supra. Based on Volpe's uncontradicted testimony, the trial court did not err in finding consent to the search.

{¶45} Finally, appellant challenges the court's *Miranda* ruling. Appellant argues that he did not validly waive his rights. However, the evidence reflects that appellant intended to talk to police in an effort to avoid criminal charges. Although an express waiver was not presented in the instant case, there was evidence that after appellant initiated conversation with police, appellant was read his *Miranda* rights, indicated that he understood his rights, and subsequently made a statement to police. When a suspect understands his rights in full, he waives his right to remain silent by making a voluntary statement to police. *Berghuis v. Thompkins* (2010), ___ U.S. ____, 130 S.Ct. 2250, 2264, 176 L.Ed.2d 1098 (fact that defendant was silent during first two hours and 45 minutes of three hour interrogation was insufficient to invoke his right to remain silent under *Miranda*).

{¶46}  The assignment of error is overruled.

{¶47}  The judgment of the Stark County Common Pleas Court is affirmed.

By: Edwards, J.

Gwin, P.J. and

Wise, J. concur

_____

_____

_____

JUDGES

JAE/r0720

[Cite as *State v. Hall*, 2011-Ohio-5096.]

IN THE COURT OF APPEALS FOR STARK COUNTY, OHIO

FIFTH APPELLATE DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | |
| | : | |
| | : | |
| -vs- | : | JUDGMENT ENTRY |
| | : | |
| GERALD R. HALL | : | |
| | : | |
| Defendant-Appellant | : | CASE NO. 2011CA00032 |

For the reasons stated in our accompanying Memorandum-Opinion on file, the judgment of the Stark County Court of Common Pleas is affirmed. Costs assessed to appellant.

_____

_____

_____

JUDGES