COMMONWEALTH of Kentucky,
Appellant,

v.

Billy COX, Appellee.

2013–SC–000618–DG

Supreme Court of Kentucky.

RENDERED: DECEMBER 17, 2015

Rehearing Denied June 16, 2016

Counsel for Appellant: Jack Conway, Attorney General of Kentucky, Joseph Hubert Mattingly, III, Special Assistant Attorney General, Office of the Marion County Attorney.

Counsel for Appellee: Gregory Dean Simms, Murphy & Powell, PLC, Louisville.

## OPINION OF THE COURT BY CHIEF JUSTICE MINTON

We granted discretionary review in this case to determine whether a police roadblock designed to remove drunk drivers from state highways amounted to an unreasonable seizure in violation of both the Fourth Amendment to the United States Constitution and Section 10 of the Kentucky Constitution. Billy Cox was convicted of driving a motor vehicle under the influence of alcohol (DUI) after being stopped at a roadblock. The Court of Appeals found the roadblock unconstitutional because law enforcement failed to follow proper procedures in implementing a legal roadblock and, accordingly, reversed his conviction. We affirm.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

Billy Cox was stopped at a roadblock conducted by the Kentucky State Police (KSP) at a highway intersection. As Cox approached the roadblock, one of the troopers noticed that he was not wearing his seatbelt. When questioned, Cox admitted to drinking two beers over dinner at a nearby restaurant. The trooper observed that Cox's speech was slurred, his eyes appeared bloodshot and glassy, and the trooper smelled alcohol on his breath. After failing three field sobriety tests, the trooper believed that Cox was operating

his vehicle under the influence of alcohol and placed him under arrest.

At the time Cox was stopped, the roadblock had been in operation for just over an hour. The roadblock was set up moments after troopers received approval from a superior officer. Trooper Rhodes, who was placed in charge of the checkpoint, arrived at the checkpoint area twenty minutes after the roadblock began. There were no media announcements that traffic checkpoints were planned, nor were there any signs indicating an upcoming roadblock on the highway. Trooper Walker, the arresting officer, was not wearing a safety vest. Troopers working the roadblock did, however, activate the emergency lights on their vehicles to alert oncoming traffic of the stop, and every vehicle that approached was checked.

A Marion District Court jury convicted Cox of second-offense driving under the influence (DUI II), failure to wear a seatbelt, and possession of an open alcohol container in a vehicle. He was sentenced to fourteen days in jail, a $350 fine, and an additional thirty days of community service. Cox's conviction and sentence were affirmed by the circuit court.

The Court of Appeals granted discretionary review and reversed the circuit court, holding that evidence leading to Cox's conviction was unconstitutionally obtained. Primarily, the Court of Appeals panel was "troubled" by the procedures the KSP employed in creating the roadblock and that the checkpoint appeared to grant "unfettered discretion" to KSP troopers, contrary to the safeguards we offered in *Commonwealth v. Buchanon.*[1] The Commonwealth sought discretionary review from this Court. We granted review and, accordingly, affirm the Court of Appeals. If law enforcement is permitted to continue conducting indiscriminate seizures of individuals at a roadblock without any basis in suspicion, we must ensure that officers do not abuse this privilege.

## II. ANALYSIS.

The Commonwealth petitioned for our review to determine whether the Court of Appeals erroneously held that the KSP roadblock was unconstitutionally implemented. Specifically, the Court of Appeals determined that the procedures the KSP employed to set up the roadblock that led to Cox's arrest failed to comply with the processes necessary to implement a suspicionless traffic stop. We rely on well-established Supreme Court precedent, in addition to one landmark case from this Court that speaks directly on the issue before us, in reaching our decision.

### A. Legal Background.

■ The Fourth Amendment to the United States Constitution mandates any warrantless search or seizure to be reasonable.[2] The Supreme Court has held that briefly stopping motorists at government-designated highway checkpoints constitutes a seizure for purposes of the Fourth Amendment.[3] A seizure is generally unreasonable in the absence of a warrant or

---

1. 122 S.W.3d 565 (Ky.2003).

2. U.S. Const. amend. IV. *See also* Ky. Const. § 10. The Kentucky Constitution on this subject mirrors its federal counterpart and is considered co-extensive to the Fourth Amendment. *See LaFollette v. Commonwealth,* 915 S.W.2d 747 (Ky.1996) ("... Section 10 of the Kentucky Constitution provides no greater protection than does the federal Fourth Amendment.").

3. *See Michigan Dept. of State Police v. Sitz,* 496 U.S. 444, 450, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990). *See also United States v. Martinez–Fuerte,* 428 U.S. 543, 556, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976).

individualized suspicion.[4] Though checkpoints like the one in question are not effectuated by a warrant nor based on any level of individualized suspicion, this practice is nonetheless considered consistent with the Fourth Amendment.[5] The Supreme Court upheld DUI checkpoints because the government's strong interest in removing drunk drivers from state highways greatly outweighs the brief intrusion on motorists stopped at the roadblock.[6]

Recognizing the potential for abuse, the Supreme Court supplied a balancing test for determining whether specific traffic checkpoints are reasonable. The general test for the reasonableness of a seizure requires a reviewing court to "[weigh] the gravity of the public concerns saved by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty."[7]

In *City of Indianapolis v. Edmond,* the Supreme Court updated the analysis.[8] In *Edmond,* the Court held that in addition to conducting the traditional balancing test for reasonableness, courts must review the purpose of the roadblock.[9] Law enforcement may not impose checkpoints "whose primary purpose is to detect evidence of ordinary criminal wrongdoing."[10] Rather, roadblocks must have a "primary purpose," such as keeping the roads safe

from impaired drivers or maintaining border security.[11]

In *Commonwealth v. Buchanon,* this Court offered four general guidelines for law enforcement to follow to ensure that Kentucky roadblocks are in line with the Supreme Court's Fourth Amendment analysis:

1. It is important that decisions regarding the location, time, and procedures governing a particular roadblock should be determined by those law enforcement officials in a supervisory position, rather than by the officers who are out in the field. Any lower ranking officer who wishes to establish a roadblock should seek permission from supervisory officials. Locations should be chosen so as not to affect the public's safety and should bear some reasonable relation to the conduct law enforcement is trying to curtail.[12]

2. The law enforcement officials who work the roadblock should comply with procedures established by their superior officers so that each motorist is dealt with in exactly the same manner. Officers in the field should not have unfettered discretion in deciding which vehicles to stop or how

4. *See City of Indianapolis v. Edmond,* 531 U.S. 32, 37, 121 S.Ct. 447, 148 L.Ed.2d 333 (2000).

5. *Sitz,* 496 U.S. at 450, 110 S.Ct. 2481.

6. *Id.*

7. *Brown v. Texas,* 443 U.S. 47, 50–51, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979).

8. 531 U.S. 32, 121 S.Ct. 447, 148 L.Ed.2d 333 (2000).

9. *Id.* at 46, 121 S.Ct. 447 (". . . our cases dealing with intrusions that occur pursuant to

a general scheme absent individualized suspicion have often required an inquiry into purpose at the programmatic level.").

10. *Id.* at 41–42, 121 S.Ct. 447.

11. *Id.* at 47, 121 S.Ct. 447 (upholding the constitutional purposes articulated in *Sitz* and *Martinez–Fuerte* in contrast to the unconstitutional purpose of ordinary criminal wrongdoing).

12. *Buchanon,* 122 S.W.3d at 571.

each stop is handled.[13]

3. The nature of the roadblock should be readily apparent to approaching motorists. At least some of the law enforcement officers present at the scene should be in uniform and patrol cars should be marked in some manner. Signs warning of a checkpoint ahead are also advisable.[14]

4. The length of the stop is an important factor in determining the intrusiveness of the roadblock. Motorists should not be detained any longer than necessary in order to perform a cursory examination of the vehicle to look for signs of intoxication or check for license and registration. If during the initial stop, an officer has a reasonable suspicion that the motorist has violated the law, the motorist should be asked to pull to the side so that the other motorists can proceed.[15]

We further elaborated that this list is not exhaustive and violation of one factor alone does not necessarily result in a constitutional violation.[16] The four *Buchanon* factors are simply to be used as guidelines for law enforcement in ensuring that the checkpoints they establish are constitutionally reasonable temporary seizures.

## B. *Applying* Buchanon *to Cox.*

From a bird's-eye view of *Buchanon*, it is clear we strongly disfavor hastily arranged highway checkpoints. It is implicit in our analysis that without proper planning and notice, roadblocks are susceptible to the type of discretion and intrusion the Fourth Amendment exists to forbid. It is unclear to us here whether those discretion-limiting procedures were adequately performed. A focused analysis of the facts of this case in comparison to the *Buchanon* guidelines ultimately confirms our suspicions that the proper procedures were not in place in establishing the roadblock that ultimately led to Cox's arrest.

██ Marion County KSP appeared to satisfy the first *Buchanon* factor by seeking approval from supervising officers. It is undisputed that Trooper Walker sought approval to set up a roadblock from Sergeant David Gibbs. Moreover, the roadblock's location was selected from a list of pre-approved KSP sites. Finally, we may presume that this location was pre-approved because of its relation to the KSP's goals in finding intoxicated motorists. So the first factor is apparently satisfied in this case.

The Court of Appeals relied heavily on this factor in reversing Cox's conviction. The panel found that the limited time difference between placing the roadblock request and Sergeant Gibbs's approval precluded any meaningful review and supervisory guidance. This was underscored by the fact that Trooper Rhodes, the designated officer in charge, arrived at the site twenty minutes after the checkpoint began. We agree that any supervision here is likely cursory, but we also cannot say the KSP failed to seek approval from a superior officer before beginning the checkpoint. Compliance with this factor is ambiguous.

██ The second factor is even less clear. There is nothing to suggest that the troopers conducting the roadblock failed to follow any of Sergeant Gibbs's directions. But, simultaneously, there is also nothing to suggest Sergeant Gibbs

13. *Id.*

14. *Id.*

15. *Id.*

16. *Id.*

provided any direction or suggested any procedures for treating all motorists the same. Despite no apparent express policy for the uniform treatment of stopped drivers at the roadblock, the facts show that the troopers did not in fact exercise unfettered discretion in operating the checkpoint that evening. Trooper Walker testified that they stopped every car that approached the roadblock. The second *Buchanon* factor seems to have been satisfied.

■ The third factor is more problematic. Here, it is difficult for us to imagine how the roadblock is readily apparent to approaching motorists. We consider this factor effectively to require adequate notice. The facts reveal that KSP troopers were already at the roadblock site when Sergeant Gibbs approved the checkpoint, and its operation began almost immediately. The presiding troopers did not erect warning signs down the road to inform vehicles approaching the site, nor did they post any announcements of a proposed checkpoint to the media. The KSP did turn on their emergency lights at the roadblock and officers were in uniform, but this is not enough to provide adequate notice to approaching motorists. The roadblock began almost instantaneously without any apparent concern for affording motorists prior notice, which the third *Buchanon* factor implicitly mandates.

■ Finally, the KSP seems to have complied with the fourth factor. The Court of Appeals cited the undetermined length of the roadblock that night as a central reason for concluding the checkpoint was unreasonable. While undetermined durations may be symptomatic of broad discretion, this factor focuses more on individualized stops themselves and less on the duration of the checkpoint process

as a whole. Review of Cox's particular stop reveals that it was no more intrusive than necessary for Trooper Walker to obtain his license and registration and quickly ascertain reasonable suspicion of a DUI. Though there were many procedural problems in implementing the DUI checkpoint, we cannot say Cox's stop itself was impermissibly prolonged.

■ This is an admittedly difficult case where the facts simply do not fall in perfect order with the guidelines we established in *Buchanon,* and perfect compliance was never our intention when we announced them over a decade ago. But a closer look at *Buchanon* offers us additional guidance. There, we also faced a particularly difficult situation; and we declared that "we must err on the side of caution when dealing with the most fundamental of those rights granted to our citizens to be free from unreasonable searches and seizures." [17] In circumstances where the practices and procedures employed by law enforcement are constitutionally ambiguous, it is our duty to protect individuals against the risk of potentially unreasonable seizure without any suspicion of wrongdoing. Though we do not require rigid compliance with the *Buchanon* guidelines, we cannot continue to soften the edges of what is constitutionally reasonable.

Nothing in our decision today should be construed to disparage *Buchanon* or the various Supreme Court precedents legitimizing checkpoints to purge drunk drivers from our highways. We understand the grave danger intoxicated drivers create on the roads, and we presume that law enforcement generally acts honorably in its efforts to protect innocent motorists from the recklessness of impaired drivers. But we must also secure the blessings of liber-

---

17. *Buchanon,* 122 S.W.3d at 570.

ty preserved through our foundational documents. We simply cannot conclude that law enforcement adequately complied with the *Buchanon* factors substantially enough to render this roadblock a "reasonable" seizure performed in the absence of a warrant or individualized suspicion.

## III. CONCLUSION.

For the foregoing reasons, we affirm the determination of the Court of Appeals that Cox's arrest and conviction was the fruit of an unconstitutional seizure.

All sitting. Abramson, Keller, Venters, JJ., concur. Noble, J., concurs by separate opinion. Cunningham, J., dissents by separate opinion in which Wright, J., joins.

NOBLE, J., CONCURRING:

I fully concur with the Chief Justice's well-reasoned opinion, but write to be even more emphatic and to elaborate on the rights of the citizens involved in roadblocks.

As the Chief Justice articulates, the Fourth Amendment to the United States Constitution and our own Kentucky Constitution, which mirrors the federal language, mandate that any warrantless search be legally reasonable. Warrantless searches of private homes and seizures therein are *per se* unreasonable, absent exigent circumstances, but warrantless stops of vehicles may be reasonable under more circumstances. Ordinarily, if there is no warrant, the stop must be based on an "individualized reasonable articulable suspicion that criminal activity is afoot." *Nunn v. Commonwealth*, 461 S.W.3d 741, 746 (Ky.2015) (citing *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). This is commonly known as a *Terry* stop. But stops made with a roadblock, by their very nature, lack both a warrant for each car stopped and an indi-

vidualized suspicion about unobservable illegal conduct until the car is stopped.

But the Supreme Court has nevertheless held that roadblock stops may be reasonable because there is a strong public interest in removing incapacitated drivers from operating potentially deadly vehicles on the highways that outweighs the limited Fourth Amendment intrusion of a stop under the right circumstances. But to satisfy this balance, the intrusion must meet restricting criteria: have a reasonable relation to the conduct law enforcement wants to stop; be brief and of a duration no greater than necessary to promote the reason for the roadblock; follow established procedures to insure uniform application; and the reason for the road block should be apparent. *Commonwealth v. Buchanon*, 122 S.W.3d 565, 570-71 (Ky. 2003). Thus road blocks are an acceptable law enforcement practice, but we must never lose sight of the fact that allowing them is an exception to a warrantless search.

This is important because unreasonable governmental intrusion into a person's life is not constitutional and further undermines a citizen's belief that it is reasonable for that government to be allowed to govern him. Fundamental to that statement is the belief that governments exist at the will of the governed, and not the other way around, in a democratic society. Freedom from a warrantless search is an important individual right that enables living freely. Thus, when an exception to the warrantless search requirement of the Fourth Amendment is allowed, it must be reasonable, or what the average citizen is willing to accept, because of the public good that comes from the exception.

*Buchanon* is a strong Kentucky case that imposes reasonable restrictions on the operation of a road block, and the Chief

Justice thoroughly applies its requirements to the facts of this case. The majority opinion, however, goes even further than *Buchanon* by taking the advisory language therein—"[s]igns warning of a checkpoint ahead are advisable," *id.* at 571—and makes the warning signs a necessary requirement for the road block to be reasonable. I completely agree with this, because this requirement clarifies what will happen to the person if he proceeds.

At the heart of that reasoning is the fact that with the presence of a sign warning of a road block ahead, if a citizen proceeds to the roadblock, he has *functionally consented* to the ensuing encounter with the police. It is this functional, or implied, consent that allows the roadblock stop to be reasonable despite the absence of a warrant or any individualized, articulable suspicion of criminal activity. The only exception might be where the driver has no choice but to proceed, where, for example, there is no opportunity to turn around or onto another road after having notice of the roadblock ahead. But absent an argument that encountering the roadblock was a necessity, there can be no valid argument that the stop at the roadblock is unreasonable if all the other *Buchanon* restrictions are properly in place.

By the same token, if proceeding to the roadblock serves as consent, then turning away from the road block is simply *not* consenting, and is the equivalent of requiring law enforcement to get a warrant if they wish to stop your vehicle, absent some other qualifying fact such as observable (plain-view) illegality. There is significant clarity in this reasoning that leads to a further conclusion: the *purpose* of the restrictions and the notice requirement is to allow a citizen to make an informed choice about whether he submits himself to the roadblock. What other purpose is

there for a sign warning that a road block is ahead? It is ludicrous to say that the warning is for informational purposes only. The driver will have the information soon enough when he comes upon the road block. And how does simply knowing that a road block lies ahead help the driver? Obviously people are given information so that they may *do something* with it. Regarding a road block, that information is for the purpose of allowing a citizen to choose not to consent to a warrantless seizure.

With this understanding in mind, I turn to a discussion of a former case of this Court, *Bauder v. Commonwealth*, 299 S.W.3d 588 (Ky.2009), which has a holding that is dissonant with the holding in this case. The defendant in that case, Bauder, approached a roadblock at which no cars were waiting, stopped abruptly 100 feet away and turned onto a side road, and reentered the highway beyond the road block. He was not speeding, nor was he acting in any other observably criminal manner; he simply chose not to go through the road block. This Court, in a 4–3 decision, accepted that the police officer's "training and experience" allowed him, in those circumstances, to form a reasonable suspicion that the driver of the vehicle was avoiding the road block to evade arrest or detection, sufficient to allow the officer to leave the road block, to follow the driver (Bauder), and to stop him.

The important point to note is that Bauder had done nothing at all "suspicious" except to choose not to go through the roadblock. And while it is possible he did so in order to avoid detection of drinking, it is also feasible that he simply did not consent to go through the road block. Or he could have had numerous other reasons for wanting to get on home. It is truly immaterial that Bauder turned out to have

been drinking. At the decision-making point, the officer knew only that Bauder avoided the roadblock, and that standing alone cannot be grounds for a warrantless search if avoiding the roadblock amounts to an exercise of a constitutional right. Certainly, it takes no great "experience and training" to suspect at that point that Bauder wanted to avoid the road block. That was indeed apparent by his conduct. But the officer had nothing else to make his suspicion reasonable enough to chase and stop the driver.

Allowing an officer to justify a warrantless stop and search based solely on a driver's avoidance of an upcoming roadblock is no different than allowing an officer to justify a warrantless search of a car at a traffic stop simply because the pulled-over driver refused to consent to the search when requested. Of course, the latter officer could never justify the search by saying that, in his experience, those who refuse to consent to warrantless searches are usually hiding criminal activity. Why should nonconsensual, warrantless roadblock searches be treated any differently? Both are unreasonable and unconstitutional.

And while the legality of the road block was not in issue in *Bauder,* now that we are considering the meaning and purpose of allowing roadblocks in the first instance, and the rights of citizens that are affected by the roadblock, and having concluded that there is a requirement for a meaningful warning about the roadblock so that warrantless searches may not be unreasonably imposed, the majority opinion in *Bauder* was obviously wrong. If the purpose of the notice or warning of this limited ability to do a warrantless search is to give citizens meaningful information, then we cannot snatch the right not to consent from a driver when he chooses that option, absent other factors that make stopping

him reasonable after he avoided the roadblock.

This Court certainly should not speak out of both sides of its mouth on this issue. When Bauder avoided the road block, he functionally chose to require the police to obtain a warrant to stop him rather than consenting to a warrantless stop. I submit that no court would have granted the pursuing police officer a warrant under facts where a driver does absolutely nothing except avoid the roadblock. Though a slight burden, probable cause does require a reasonable belief that a crime has been or is being committed. The officer exceeded the purpose of the roadblock by leaving it and chasing off after Bauder. And, obviously, it is not practical to get a warrant to chase roadblock avoiders.

This nonetheless does not mean that drivers who avoid a road block, *and do nothing else,* have any less Fourth Amendment rights than the next person. If he is given a warning of a roadblock ahead, common sense tells us that this warning is to give him the choice to consent to the stop and search or to withhold consent by turning away when possible. This is because roadblocks are generally *not favored,* because they are a violation of the right not to be seized without a warrant when there is no other individualized reasonable, articulable suspicion that a crime has been or is being committed. The brief stop of a roadblock can only become prolonged and potentially lead to an arrest and a deeper search when the officer actually knows of other factors that support the suspicion that a crime has been committed or is in progress, such as the smell of alcohol or the observable presence of open alcohol containers or other contraband in the vehicle. That was not the case in *Bauder,* and after today, that case is clearly only an outlier.

Finally, I would note that while here we have discussed drinking drivers, and the state's purpose of keeping unsafe drivers off the highways, the rules regarding road blocks apply to *any* road block, for any appropriate governmental purpose. These often include looking for stolen vehicles or fugitives, such as escaped convicts, and other important reasons. That the road block is set up for a significant or important purpose does not mean that a citizen must endure it if his Fourth Amendment rights are not properly protected. If the innocent citizen—indeed most people going through any road block are innocent—must endure the minimal invasion of his Fourth Amendment rights on behalf of the governmental purpose at stake, he need endure only that, and no more. If he has the right to be given notice of the road block so that he may meaningfully choose to avoid it, then he cannot have that act used as the basis of forming a viable suspicion that he has done something else wrong that allows the very stop and search he has just declined, if that is the only basis of the suspicion.

## CUNNINGHAM, J., DISSENTING:

I respectfully and mildly dissent from the Chief Justice's well written opinion. I respectfully, but strongly, disagree with Justice Noble's concurring opinion in this case.

It appears to me that the Majority opinion does an accurate and well-reasoned analysis of the constitutional requirements for roadblock license and sobriety checks. The opinion is assuredly correct when it states that our U.S. Supreme Court has upheld checkpoints because the public interest in removing drunk drivers from our public highways trumps any brief imposition placed upon the traveling public being stopped on the highway. It is further correct that our own *Buchanon* case estab-

lishes four general guidelines in determining if the roadblock meets constitutional muster. *Commonwealth v. Buchanon*, 122 S.W.3d 565, 571 (Ky.2003). I continue my agreement with the Chief Justice's reliance on the *Buchanon* factors as well as his added caveat that the "list is not exhaustive, *and violation of one factor alone does not necessarily result in a constitutional violation.*" (emphasis added). I part ways with the opinion as to how the analysis is applied to this case.

The Majority opinion seems to contradict its own declaration that one deficient factor is not lethal to the validity of the roadblock. This creates the very point of our disagreement. Our Court seems to find that the roadblock was basically in compliance with three of the four requirements. That is, the Majority states that the roadblock lacked adequate notice by not erecting warning signs down the road or posting any announcement of the upcoming checkpoint. That is only one violation of the four requirements. In light of the fact that there were parked police cruisers with lights flashing, I do not believe that the lack of warning signs or announcements was in and of itself fatal to the stop. Therefore, I believe that under the totality of the circumstances there was substantial compliance with *Buchanon* and the myriad of U.S. Supreme Court cases dealing with this issue.

More importantly, I find it is necessary to confront the faulty reasoning of Justice Noble's concurring opinion. For good reason, the Majority opinion does not mention our *Bauder* decision. *Bauder v. Commonwealth*, 299 S.W.3d 588 (Ky.2009). While both cases deal with police traffic checkpoints, the issues involved are totally unrelated. It appears that my highly esteemed sister on the Court attempts to resurrect her dissenting vote in *Bauder* and shoe

horn it into this case to make it read something which it does not.

It is certain that neither our forefathers who fashioned the Fourth Amendment to our U.S. Constitution nor our Kentucky ancestors who wrote Section 10 to our State Constitution envisioned the automobile. They certainly did not anticipate how it has taken over our lives and shaped our country. Nor could they have foreseen the heart wrenching slaughter on our highways from drunk drivers.

The U.S. Supreme Court over the past 100 years has had to deal with how the automobile is to be treated under the Fourth Amendment. Surely this small compartment of steel on wheels, racing down the public highways, is not a dwelling or building as envisioned by the founding fathers. Yet, it became apparent as the car became more sophisticated that it was an enclosure within which Americans were spending more and more time, and which they were developing more and more an expectation of privacy. At the same time, because of the mobility of the automobile, and its invasion of our publicly financed roads, the State had a critical interest in regulating its use and the sobriety of its drivers. So, the high Court went to work on fashioning a special approach to vehicles that tried to protect both the public interest of maintaining safe highways and the private interest of freedom from unlawful search and seizure. This long constitutional journey began a little over ninety years ago. In the 1925 case of *Carroll v. U.S.*, 267 U.S. 132, 152, 45 S.Ct. 280, 69 L.Ed. 543 (1925), the U.S. Supreme Court recognized that the horseless carriage was subject to a different Fourth Amendment analysis from the home. *Id.* at 153, 45 S.Ct. 280. This approach was followed in later cases where the more stringent Fourth Amendment protections

afforded a dwelling did not apply to a car. *See U.S. v. Martinez–Fuerte*, 428 U.S. 543, 561, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976) (citing *McDonald v. United States*, 335 U.S. 451, 69 S.Ct. 191, 93 L.Ed. 153 (1948)); *see also U.S. v. Ortiz*, 422 U.S. 891, 896 n. 2, 95 S.Ct. 2585, 45 L.Ed.2d 623 (1975). While the owner of an automobile and its occupants have Fourth Amendment protection from unlawful search and seizures, a warrantless search may still be conducted as long as the officer has probable cause justifying the stop. *See Wilson v. Commonwealth*, 37 S.W.3d 745, 749 (Ky. 2001) (holding that an officer may lawfully conduct a traffic stop if he or she has probable cause to believe that a traffic violation has occurred) (citing *Whren v. U.S.*, 517 U.S. 806, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996)). Law enforcement may also conduct investigatory stops for the purpose of investigating possible criminal activities based upon "reasonable suspicion." *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). What is "reasonable suspicion" must be based on the totality of the circumstances, *U.S. v. Arvizu*, 534 U.S. 266, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002).

A constitutional journey dealing with the roadblock began in *Martinez–Fuerte*, 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116. In that case, the highest Court recognized that the stopping of a traveling motorists was a seizure under our Fourth Amendment and entitled to its protection. *Id.* at 555, 96 S.Ct. 3074. However, it also recognized the legitimacy of the stopping of cars at a checkpoint some sixty miles from the Mexican border in order to check for illegal aliens. *Id.* As the Court stated, "The regularized manner in which established checkpoints are operated is visible evidence, reassuring to law-abiding motorists, that the stops are duly authorized and

believed to serve the public interest."[18] *Id.* at 559, 96 S.Ct. 3074.

Three years later in *Delaware v. Prouse*, 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979), the Court made it clear that the stop of individual motorists at the whim and discretion of law enforcement officers under the auspices of checking for proper car registration would not be allowed. One of the Court's main concerns of the individualized and selective stop as in *Prouse* was the unsettling surprise and even fright of being pulled over unexpectedly. The Court found that concern was ameliorated with the properly regulated roadblock. The Court stated that the roadblock stops are acceptable because the "generating of concern or even fright on the part of lawful travelers is appreciably less in the case of a checkpoint stop." *Martinez–Fuerte*, 428 U.S. at 558, 96 S.Ct. 3074.

So it is to reassure the "law-abiding motorists" that they are not being selectively picked out for scrutiny. The main reason for clear notice of what is taking place is to be seen by the traveling public.

Continuing on the road checkpoint law, we come to the 1990 *Sitz* case which brings together roadblock law and specifically repudiates the reasoning of the concurring opinion in this case. *Michigan Dept. of State Police v. Sitz*, 496 U.S. 444, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990). In this seminal decision our nation's highest Court fully endorsed the use of properly operated police roadblocks to check for drunk drivers just as roadblocks were justified to detect illegal aliens in *Martinez–Fuerte*. Lamenting the magnitude of the drunken driving problem on our highways, it fully endorsed the state's interest in its eradication. *Sitz*, 496 U.S. at 451, 110 S.Ct.

2481 (citing *Breithaupt v. Abram* 352 U.S. 432, 77 S.Ct. 408, 1 L.Ed.2d 448 (1957) ("The increasing slaughter on our highways ... now reaches the astounding figures only heard of on the battlefield.")).

The Michigan Court of Appeals, from which the state appealed, followed the reasoning expounded by Justice Noble's concurrence. It found that the intrusion upon the motorists was impermissible because "the record failed to demonstrate that approaching motorists would be aware of their option to make U-turns or turnoffs to avoid the checkpoints." *Sitz*, 496 U.S. at 452, 110 S.Ct. 2481.

In reversing the Michigan highest court, our U.S. Supreme Court rejected that notion by stating, "We believe the Michigan courts misread our cases concerning the degree of 'subjective intrusion' and the potential for generating fear and surprise. The 'fear' and surprise' to be considered are not the natural fear of one who has been drinking over the prospect of being stopped at a sobriety checkpoint but, rather, the fear and surprise engendered in law-abiding motorists by the nature of the stop." *Id.*

In other words, the appropriate notice of the upcoming roadblock is not a highway *Miranda* warning giving all motorists the option to turn around. It is a notice of lawful authority ahead, stopping everyone that is coming through. Unlike the individualized stop condemned in *Prouse*, everyone is being pulled over. You can relax.

The last stop on the "road to roadblock law" was a little over fifteen years ago in the U.S. Supreme Court case of *City of Indianapolis v. Edmond*, 531 U.S. 32, 121 S.Ct. 447, 148 L.Ed.2d 333 (2000), cited by

---

**18.** It is noteworthy to point out that the Court also condoned diverting of some motorists to a more extensive questioning if they were of Mexican descent. This subsequent intrusion provides subtle support for our *Bauder* decision.

the Chief Justice in the majority opinion. That decision reaffirmed the legitimacy of the State's use of roadblocks for the detection of offenses which deal particularly with highway safety. Thusly, checkpoints for drunk drivers and proper automobile licensing were once again upheld. In *Edmond*, however, the high Court proclaimed that such procedures could not be set up for the purpose of drug interdiction or any other "general interest in crime control." By placing limitation upon the use of such roadblocks, the high Court underscores once again the importance it places in the public interest in getting drunk drivers off the road. It would be totally incongruous and inconsistent with this aim—even nonsensical—if the U.S. Supreme Court required ample notice of the upcoming roadblock for the purpose of giving the traveling public, including drunken drivers, the option of turning around and driving drunk somewhere else. But that is exactly the position the concurring opinion takes in this case.

Must everyone stop at one of these roadblocks? Can one blow off the officer and speed right past? Can a motorist be cited for not stopping? That question is yet to be decided. But it doesn't make sense for the U.S. Supreme Court to support well regimented roadblocks to catch drunk drivers, if it would permit all motorists, including drunk drivers, to turn around and drive the other way. A voluntary roadblock for drunk drivers sounds ludicrous.[19]

I am not alone in my position. And some have said it better. "A bright-line rule that a vehicle that flees from a roadblock necessarily arouses reasonable suspicion would be constitutional and preferable to vaguer standards for three independent reasons. First, allowing drivers to legally turn around at checkpoints undermines the constitutional justification behind the checkpoints. Second, road checkpoint evasions involve flight from police under circumstances that should suffice to create reasonable suspicion under existing flight doctrine. Finally, a bright-line rule will help limit police discretion and thus further the essential purpose of the Fourth Amendment." Shan Patel, Note, *Per Se Reasonable Suspicion: Police Authority to Stop Those Who Flee from Road Checkpoints*, 56 Duke L.J. 1621, 1642 (2007).

Says North Carolina's highest court: "the purpose of any checkpoint ... would be defeated if drivers had the option to 'legally avoid,' ignore or circumvent the checkpoint...." *State v. Foreman*, 351 N.C. 627, 527 S.E.2d 921, 924 (2000).

While the U.S. Supreme Court has not yet weighed in on the specific issue, *Sitz* did approve the diverting of the motorists for further investigation by a second officer if suspicion is aroused by the requested stop. As Justice Stevens points out in his concurrence, it can be nothing more than "a ruddy complexion, an unbuttoned shirt, bloodshot eyes, or speech impediment...." *Sitz*, 496 U.S. at 465, 110 S.Ct. 2481 (J. Stevens Dissent). Surely turning around and going the other way is equally suspicious. Totally innocent, perhaps in reality, but suspicious at the time to the responsible and vigilant eye of the police-

19. KRS 520.100(1)(b) defines the crime of fleeing or evading a police officer in the second degree as "while operating a motor vehicle with intent to elude or flee, the person knowingly or wantonly disobeys a recognized direction to stop his vehicle, given by a person recognized to be a peace officer." There is a caveat that the offense does not pertain to direction of a "traffic control officer." The commentary is not clear as to whether an officer conducting a roadblock would be a "traffic control officer" since that exclusion is predicated upon the assumption that there are adequate traffic offenses to cover that situation. Of course there is no traffic offense to cover failure to stop at a police roadblock.

man conducting a roadblock to catch drunk drivers. That is all that we say in *Bauder.*

To the credit of the Majority in this case, and contrary to the concurring opinion of Justice Noble, this opinion has nothing to do with *Bauder.* If it had, the learned Chief Justice would have said so.

For all of the above stated reasons, I dissent.

Wright, J., joins.