RENDERED: MAY 27, 2022; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2019-CA-1396-DG

JAMES MEREDITH                                                          APPELLANT

ON DISCRETIONARY REVIEW
FROM OLDHAM CIRCUIT COURT
v.            HONORABLE KAREN CONRAD, JUDGE
ACTION NO. 19-XX-00002

COMMONWEALTH OF KENTUCKY                                     APPELLEE

OPINION
AFFIRMING

** ** ** ** **

BEFORE: JONES, LAMBERT, AND K. THOMPSON, JUDGES.

THOMPSON, K., JUDGE: James Meredith has been granted discretionary review

from the opinion and order of the Oldham Circuit Court affirming the Oldham

District Court's denial of his motion to suppress evidence obtained at a roadblock

set up and operated by the Oldham County Police Department (OCPD). We affirm

because Meredith was not improperly seized through the use of this particular roadblock.

At approximately 12:05 a.m. on July 19, 2015, Meredith was stopped at a roadblock operated by the OCPD on northbound exit ramp 22 of I-71 at its intersection with Highway 53 in Oldham County, Kentucky. As a result of the stop, Meredith was arrested and charged with driving under the influence (DUI).

Meredith filed a motion to suppress the evidence before the district court, arguing that the roadblock violated his Fourth Amendment rights and was unconstitutional because it did not comply with the factors set forth in *Commonwealth v. Cox*, 491 S.W.3d 167 (Ky. 2015), and *Commonwealth v. Buchanon*, 122 S.W.3d 565 (Ky. 2003).

Following a hearing, the district court denied Meredith's motion. Meredith ultimately entered a conditional guilty plea pursuant to Kentucky Rules of Criminal Procedure (RCr) 8.09 to DUI, first offense. On direct appeal, the circuit court affirmed. Meredith sought discretionary review, which we granted.

"Our standard of review of the trial court's denial of a suppression motion is twofold. First, the trial court's findings of fact are conclusive if they are supported by substantial evidence; and second, the trial court's legal conclusions are reviewed de novo." *Brumley v. Commonwealth*, 413 S.W.3d 280, 283-84 (Ky. 2013). "Substantial evidence means evidence that when taken alone or in light of

all the evidence, . . . has sufficient probative value to induce conviction in the minds of reasonable men." *Turley v. Commonwealth*, 399 S.W.3d 412, 420 (Ky. 2013) (internal quotation marks, emphasis, and citation omitted). "[A] reviewing court should take care both to review findings of historical fact only for clear error and to give due weight to inferences drawn from those facts by resident judges and local law enforcement officers." *Roberson v. Commonwealth*, 185 S.W.3d 634, 637 (Ky. 2006) (quoting *Ornelas v. United States*, 517 U.S. 690, 699, 116 S.Ct. 1657, 1663, 134 L.Ed.2d 911 (1996)). If a trial court's findings of fact are supported by substantial evidence the next question addressed by the reviewing court is "whether the rule of law as applied to the established facts is or is not violated." *Adcock v. Commonwealth*, 967 S.W.2d 6, 8 (Ky. 1998) (quoting *Ornelas*, 517 U.S. at 697, 116 S.Ct. at 1662).

A highway stop of motorists at a government-operated roadblock constitutes a seizure for Fourth Amendment purposes. *Michigan Dep't of State Police v. Sitz*, 496 U.S. 444, 450, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990). "A seizure is generally unreasonable in the absence of a warrant or individualized suspicion." *Cox*, 491 S.W.3d at 169-70. To pass constitutional muster, roadblocks "must have a 'primary purpose,' such as keeping the roads safe from impaired drivers or maintaining border security." *Id*. at 170. Moreover, the seizure caused by the roadblock must be reasonable. *Buchanon*, 122 S.W.3d at 568. The

Kentucky Supreme Court has enumerated non-exclusive factors for determining

the reasonableness of any roadblock:

> First, it is important that decisions regarding the location, time, and procedures governing a particular roadblock should be determined by those law enforcement officials in a supervisory position, rather than by the officers who are out in the field. Any lower ranking officer who wishes to establish a roadblock should seek permission from supervisory officials. Locations should be chosen so as not to affect the public's safety and should bear some reasonable relation to the conduct law enforcement is trying to curtail.
>
> Second, the law enforcement officials who work the roadblock should comply with the procedures established by their superior officers so that each motorist is dealt with in exactly the same manner. Officers in the field should not have unfettered discretion in deciding which vehicles to stop or how each stop is handled.
>
> Third, the nature of the roadblock should be readily apparent to approaching motorists. At least some of the law enforcement officers present at the scene should be in uniform and patrol cars should be marked in some manner. Signs warning of a checkpoint ahead are also advisable.
>
> Fourth, the length of a stop is an important factor in determining the intrusiveness of the roadblock. Motorists should not be detained any longer than necessary in order to perform a cursory examination of the vehicle to look for signs of intoxication or check for license and registration. If during the initial stop, an officer has a reasonable suspicion that the motorist has violated the law, the motorist should be asked to pull to the side so that other motorists can proceed.

*Id.* at 571.

A violation of one factor may not create "a violation of constitutional proportions." *Id.* Moreover, "[t]he guidelines are to be applied on a case-by-case basis in order to determine the reasonableness of each roadblock." *Id.*

On appeal, Meredith asserts OCPD failed to substantially comply with most[1] of the constitutional guidelines set forth above. He argues: (1) the primary purpose of the roadblock was to detect ordinary criminal wrongdoing and that was improper; (2) the only consideration with respect to the location of the roadblock was that it had been used in the past; (3) there were no written protocols in place and thus no restraints imposed on the officers while conducting stops at the roadblock; and (4) notice of the roadblock was inadequate.

We are not writing on a blank slate when it comes to the roadblock at issue as it is similar in some respects to a seizure at a prior roadblock conducted at this same location in Oldham County. When judicially reviewed, the district court deemed that prior roadblock to be an unconstitutional seizure under *Buchanon* and *Cox*, with the circuit court denying the Commonwealth's petition for a writ of prohibition, which a panel of our Court affirmed. *Commonwealth v. Wheeler*, 558 S.W.3d 475, 482 (Ky.App. 2018). In *Wheeler*, the district court determined the roadblock was inadequate because it violated the third *Buchanon* factor, lacking

---

[1] The district court found there had been no evidence presented calling the length or intrusiveness of the stop into question, and that the fourth *Buchanon* factor was therefore not at issue. Meredith offers no argument to the contrary.

"visibility" which was the same problem in *Cox* because testimony by the trooper was that "there were no road signs or cones set up to notify the public that a checkpoint was taking place[,]" there was no proof that any media notice was issued, and the only indication of the checkpoint was that both the officers working the checkpoint "had activated the emergency lights on their vehicles and were . . . wearing traffic safety vests." *Wheeler*, 558 S.W.3d at 481.

Regarding the primary purpose of the roadblock, Meredith asserts that after he was arrested, Officer (Ofc.) Steve Jenkins (the arresting officer) asked him for permission to search his car "for drugs," and Meredith argues this is evidence that the primary purpose of the roadblock was therefore "drug interdiction," which was improper. However, the district court had more than just Meredith's testimony to consider on this issue. Two of the four officers who testified at the suppression hearing participated in the roadblock that stopped Meredith: Sergeant (Sgt.) James Brown (the supervising officer) and Ofc. Jenkins. Both officers explained their directive during the administration of the roadblock was limited to looking for traffic violations, checking driver's licenses, insurance, and registration, and looking for notable indications of intoxication.

Considering all the evidence, the district court concluded that the primary purpose of the roadblock was for "public visibility and noted drug and

alcohol enforcement." It deemed this a focused and permissible purpose, unlike the detection of "ordinary criminal wrongdoing" or "drug interdiction."

We interpret the district court to be saying that the purpose of the roadblock was to detect drivers impaired by drugs and alcohol and to show drivers that officers enforce prohibitions about driving while intoxicated. This is certainly an approved purpose for a roadblock. *Compare Sitz*, 496 U.S. at 453-55, 110 S.Ct. at 2487-88 (upholding a roadblock which consisted of a "brief stop at the sobriety checkpoint" as consistent with the Fourth Amendment because "the balance of the State's interest in preventing drunken driving, the extent to which this system can reasonably be said to advance that interest, and the degree of intrusion upon individual motorists who are briefly stopped, weighs in favor of the state program.") *with City of Indianapolis v. Edmond*, 531 U.S. 32, 47, 121 S.Ct. 447, 457, 148 L.Ed.2d 333 (2000), (determining that a primary purpose of general crime control; *i.e.*, "interdicting illegal narcotics," did not justify a checkpoint program that stopped motorists without some indicia of individualized suspicion.). Substantial evidence supports the determination that detecting drivers impaired by drugs or alcohol was the primary purpose of the roadblock, thereby comporting with *Cox*.

Regarding Meredith's second argument, we disagree with him that the only consideration with respect to the location of the roadblock was that it had

been used in the past. The district court credited Sgt. Brown's testimony that the location was determined several days in advance based on a list of previously approved locations chosen due to crash volume and visibility on the highway. The district court also took notice that in a prior ruling (later affirmed by the circuit court), it had found that the location of the checkpoint had been preapproved by OCPD. Indeed, the roadblock at issue in this case was in the same location as the roadblock at issue in *Wheeler*, where the district court made the same finding that the location of the roadblock had been preapproved. Substantial evidence supports that the location of the roadblock bore a reasonable relation to the conduct law enforcement was trying to curtail.

Regarding his third argument, Meredith is correct that there were no written OCPD protocols in place regarding roadblocks when he was stopped. Having such protocols in place provides greater assurance that a roadblock is being conducted within permissible constitutional contours. However, written protocols are not a constitutional requirement of a roadblock. Rather, the primary focus is upon whether the law enforcement officials who worked the roadblock complied with the procedures established by their superior officers so that each motorist was dealt with in exactly the same manner. *Buchanon*, 122 S.W.3d at 571.

Here, decisions regarding the location, time, and procedures governing the roadblock were made by OCPD Sgt. Brown, who acted in a dual

role as both supervisor and as one of the four officers who conducted the roadblock. Sgt. Brown testified he was authorized by OCPD to do so. His signed preapproval memorandum was also introduced as evidence, indicating he authorized the roadblock on July 13, 2015, and specified it would operate from 11 p.m. through 2 a.m.[2] from July 18-19, 2015. He also testified he notified his superior officer regarding the roadblock, although he offered no documentation to that effect.

Sgt. Brown acknowledged OCPD had no written roadblock policy in force at the time of the roadblock, which he attributed to a mistake that occurred when OCPD revised its overall procedures sometime before that date. However, he testified he generally followed the department's prior roadblock policy. A copy of that three-page policy (entitled "general order OM-E-4" relating to "traffic safety checkpoints") is of record. Sgt. Brown, as well as Ofc. Jenkins, testified Sgt. Brown met with the other officers who conducted the roadblock hours before it was initiated on July 18, 2015, to review the necessary guidelines and that the roadblock was conducted pursuant to a systematic plan. Sgt. Brown testified that he and his accompanying officers stopped each vehicle approaching the checkpoint and treated each motorist in the same manner; they asked for driver's licenses,

_____

[2] During the suppression hearing, Brown testified OCPD operated the roadblock for an additional hour on July 19, 2015, so it ended at 3 a.m. rather that 2 a.m.

proof of insurance and registration, and looked for traffic violations and notable indications of intoxication. If further investigation was necessary, motorists were told to move off the traveled portion of the highway and out of the stream of traffic. The district court found this testimony to be credible and that the checkpoint was conducted in this manner.

However, the district court was troubled by Sgt. Brown's dual capacities as both supervisor *and* officer in the field. Determining this fact weighed against the Commonwealth relative to the second *Buchanon* factor, the district court explained in its order that "[a]s a practical matter, it cannot be said that the supervisory officers took discretion from the officers in the field[.]" But, balanced against the other evidence set forth above regarding the checkpoint and the conduct of the four officers operating it, the district court determined the first two *Buchanon* factors had been substantially complied with. Upon review, we cannot say the district court's determination lacked the support of substantial evidence in this respect or was otherwise erroneous.

Lastly, we consider Meredith's argument that notice of the roadblock was inadequate. The thrust of his contention is that it was impossible for any motorist to notice the roadblock until reaching a "point of no return" on exit 22 of northbound I-71 because by the time the roadblock could be observed, a service road had terminated and the exit ramp was separated from I-71 by a grassy

peninsula dotted with bushes and trees. At that point, motorists had to proceed toward the Highway 53 intersection or violate the law by backing up or reversing course on the one-way ramp. Exit 22 then curves slightly to the right, where it meets with a stoplight at its intersection with Highway 53.

The roadblock at issue in this matter was set up at the stoplight where exit 22 meets Highway 53. Sgt. Brown testified that from his vantage point at the roadblock, he could easily see vehicles on exit 22 when they reached the "point-of-no-return," which was several hundred feet away from the roadblock but he did not know if those vehicles could see the roadblock before reaching that point. Meredith, for his part, did not testify regarding the visibility of the roadblock.

Leonard Adcock, another driver who used exit 22 when the roadblock was in operation in the same location and at roughly the same time the prior day, testified he did not notice the roadblock until he was "about a hundred feet or so" onto exit 22, shortly past the "point-of-no-return." Adcock testified that upon seeing the roadblock, he tried, unsuccessfully, to avoid it by turning off his headlights, backing up a few feet, and using the service road on the left to re-enter the interstate.

Adcock testified that the roadblock was not visible until after the point-of-no-return because it was set up beyond the curve on the exit ramp, on a part of the road that, from a vantage point further back, was obstructed by the trees and

bushes on the cut in the hill.  But, he testified that he immediately recognized the roadblock for what it was upon seeing it, and he sought to avoid it because he did not have proof of insurance.

With that said, we pause here.  While the third *Buchanon* guideline indicates that warning signs are "advisable," neither *Cox* nor *Buchanon* specify that law enforcement must provide warnings sufficient to enable motorists to *avoid* roadblocks.  Rather, the purpose of providing "adequate notice" of a roadblock to motorists relates to the potential of any roadblock to generate fear and surprise, "not the natural fear of one who has been drinking over the prospect of being stopped at a sobriety checkpoint but, rather, the fear and surprise engendered in law-abiding motorists by the nature of the stop."  *Sitz*, 496 U.S. at 452, 110 S.Ct. at 2486.  The United States Supreme Court has emphasized that the potential for this fear and surprise is lessened when motorists approaching a roadblock can see visible signs of the officers' authority, and that every vehicle is being stopped.  *Id.* at 453, 110 S.Ct. at 2486-87 (relying on *United States v. Martinez-Fuerte*, 428 U.S. 543, 558, 96 S.Ct. 3074, 3083, 49 L.Ed.2d 1116 (1976)).

In *United States v. Huguenin*, 154 F.3d 547, 560 (6th Cir. 1998), the Court explained:

> In reviewing the degree of intrusion at the *Martinez–Fuerte* checkpoints, the Supreme Court emphasized the lack of discretion allocated to the operating officers, the brief duration of the stop in which just a few questions

-12-

were asked and perhaps a document reviewed, and the numerous physical and visual indicators apparent to approaching motorists. 428 U.S. at 558-59, 96 S.Ct. 3074. The challenged checkpoints were permanent structures with flashing lights and signs saying "STOP HERE – U.S. OFFICERS," cones funneling cars into appropriate lanes, uniformed border patrol officers directing traffic, and parked marked border patrol cars with activated lights. *Id*. at 546, 96 S.Ct. 3074. The Supreme Court emphasized that these indicators would inform approaching motorists that the stop was authorized and non-random, thereby lessening the potential for fear and surprise. *Id*. at 559, 96 S.Ct. 3074.

As for the appearance of the roadblock in this matter, it was in the same location as the one described in *Wheeler*, and like that roadblock which the district court deemed constitutionally insufficient, the officers conducting the roadblock were wearing reflective yellow safety vests; the flashing blue emergency lights of their vehicles were engaged; each vehicle that approached the roadblock was stopped; and each vehicle was only briefly detained. Likewise, the officers used no warning signs or cones.

However, unlike *Wheeler*, there were four officers operating this roadblock, not two; there were four different police vehicles at the roadblock with emergency lights engaged, not two; and, according to Sgt. Brown, the officers used "flashlights with orange cones on them" to guide oncoming vehicles. As discussed, Adcock testified that when he saw the roadblock, he recognized it for what it was.

-13-

Moreover, unlike *Wheeler*, there was also some evidence that OCPD notified media outlets, prior to the date of Meredith's arrest, of its intention to conduct roadblocks throughout the county. The press release Sgt. Brown created regarding roadblocks in Oldham County is of record, dated May 28, 2015. The officer in charge of sending out press releases, Major (Maj.) Jim Latham, testified he forwarded the press release to a list – included of record – of approximately fifty email recipients including reporters and news outlets on that date.

To be sure, Maj. Latham had no documentary evidence demonstrating he sent the notice; nor did he have knowledge of or control over whether any media outlets made use of the press release. Furthermore, the press release itself did not name any date, time, or location of any specific roadblock. It stated, in pertinent part:

> The Oldham County Police will be conducting traffic safety checkpoints throughout the county during the period of May, June, and July. During the checkpoints officers will be enforcing laws related to operating a motor vehicle while under the influence of drugs or alcohol, licensing of motor vehicles and operators, registration and insurance violations, seat belt and child restraint violations, and motor vehicle equipment violations.

However, the *Buchanon* and *Cox* Courts did not predicate the constitutionality of any given roadblock upon any media release, much less a media release identifying the roadblock's date, time, or location, and it was up to

-14-

the district court to evaluate the evidence and make credibility findings. Considering the evidence, we cannot say the district court committed clear error in determining that OCPD provided adequate notice of its roadblock or that any deficiency in its notice, taken in conjunction with the totality of what is otherwise set forth above, created "a violation of constitutional proportions." *Buchanon*, 122 S.W.3d at 571.

The district court considered all factors enunciated in *Buchanon* and *Cox* before denying Meredith's motion to suppress. We conclude the record supports the denial of the motion to suppress. Accordingly, we affirm the decision of the Oldham Circuit Court, affirming the Oldham District Court.

ALL CONCUR.

BRIEF FOR APPELLANT:

Edward Malone Bourne
Owenton, Kentucky

BRIEF FOR APPELLEE:

Daniel Cameron
Attorney General of Kentucky

Walter Matthew Hudson
Special Assistant Attorney General
La Grange, Kentucky